# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

## No. ACM 39646

_____

## UNITED STATES
*Appellee*

**v.**

## Jonathan D. PAINTER
Airman First Class (E-3), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 23 December 2020[1]

_____

*Military Judge:* Donald R. Eller, Jr. (motions); John C. Degnan.

*Approved sentence:* Dishonorable discharge, confinement for 1 month, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. Sentence adjudged 19 October 2018 by GCM convened at Barksdale Air Force Base, Louisiana.

*For Appellant:* Major Yolonda D. Miller, USAF (argued); Mr. Mark C. Bruegger, Esquire.

*For Appellee:* Captain Kelsey B. Shust, USAF (argued); Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Mary Ellen Payne, Esquire; Kelsey MacLeod (legal extern).[2]

*Amicus Curiae for Appellant:* Joseph A. Grossman (law student, argued); John M. Smith, Esquire (supervising attorney); Andrei A. Satchlian (law student)—The George Washington University Law School, Washington, District of Columbia.

---

[1] We heard oral argument in this case on 5 February 2020 at The George Washington University Law School, Washington, District of Columbia, as part of this court's Project Outreach.

[2] Ms. MacLeod was at all times supervised by an attorney admitted to practice before this court.

*Amicus Curiae for Appellee:* Alice Lee (law student, argued); Henry R. Molinengo II, Senior Associate Dean for Administrative Affairs and The John S. Jenkins Family Professional Lecturer in Law and Policy (supervising attorney); C'zar Bernstein (law student)—The George Washington University Law School, Washington, District of Columbia.

Before MINK, LEWIS, and D. JOHNSON, *Appellate Military Judges.*

Judge D. JOHNSON delivered the opinion of the court, in which Senior Judge MINK and Senior Judge LEWIS joined.

───────────────────

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

───────────────────

D. JOHNSON, Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault of Airman First Class (A1C) ES and two specifications of indecent recording of A1C ES[3] in violation of Articles 120 and 120c, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 920c.[4,5] The members sentenced Appellant to a dishonorable discharge, confinement for one month, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority approved the adjudged sentence.

Appellant raises seven assignments of error: (1) the court-martial lacked personal and subject matter jurisdiction; (2) the military judge abused his discretion when he denied Appellant's motion to suppress the contents of his cellular phone[6] and the derivative evidence thereof;[7] (3) Appellant's convic-

───────────────────

[3] At the time of trial A1C ES was no longer in the military.

[4] Appellant was acquitted of one specification of abusive sexual contact of A1C ES in violation of Article 120, UCMJ.

[5] All references in this opinion to the Uniform Code of Military Justice (UCMJ), the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[6] The parties at trial and on appeal used the terms "cellular phone," "phone," and "smartphone" interchangeably, as do we in this opinion.

[7] We heard oral argument on this assignment of error.

tions are legally and factually insufficient; (4) Appellant's Sixth Amendment[8] speedy trial right was violated; (5) the military judge who presided over Appellant's trial abused his discretion when he did not recuse himself; (6) Appellant is entitled to sentence appropriateness relief due to post-trial delay; and (7) the sentence of a mandatory dishonorable discharge is unconstitutional. In addition, we consider whether Appellant is entitled to relief for untimely appellate review which we consolidate with Appellant's sixth assignment of error.

Regarding Appellant's seventh issue, we find this assignment of error to be without merit for the reasons we announced in three prior cases: *United States v. Rita*, ___ M.J. ___, No. ACM 39614, 2020 CCA LEXIS 238, at *5–7 (A.F. Ct. Crim. App 17 Jul. 2020), *rev. denied*, No. 20-0365, 2020 CAAF LEXIS 571 (C.A.A.F. 15 Oct. 2020); *United States v. Plourde*, No. ACM 39478, 2019 CCA LEXIS 488, at *45–49 (A.F. Ct. Crim. App. 6 Dec. 2019) (unpub. op.), *rev. denied*, 80 M.J. 73 (C.A.A.F. 2020); and *United States v. Yates*, No. ACM 39444, 2019 CCA LEXIS 391, at *71–73 (A.F. Ct. Crim. App. 30 Sep. 2019) (unpub. op.), *rev. denied*, 80 M.J. 80 (C.A.A.F. 2020).

As to the remaining issues, we find no error materially prejudicial to Appellant's substantial rights, and affirm the findings and sentence.

## I. BACKGROUND

On 3 August 2016, Senior Airman (SrA) MA hosted a party at her apartment in celebration of A1C ES's and another co-worker's birthday. Appellant, a reservist on active duty orders at the time and a co-worker of A1C ES and SrA MA, also attended the party. At the party, A1C ES had approximately five shots of alcohol over the course of roughly three hours; it is unclear how much she had to eat during this time.

SrA MA had offered her apartment as a place for people to stay if they drank too much. Of the approximately ten guests, only Appellant and A1C ES accepted SrA MA's offer to stay the night. After a few hours most of the guests had left and SrA MA began cleaning up the apartment. A1C ES was tired and laid down on the couch to go to sleep. A1C ES remembered closing her eyes to go to sleep. After falling asleep, the next thing A1C ES recalled was waking up around 2300 to 2330 to Appellant "rubbing [her] crotch over [her] leggings."[9] A1C ES knew what time this occurred because she saw it on

---

[8] U.S. CONST. amend. VI.

[9] Appellant was acquitted of abusive sexual contact for allegedly touching A1C ES in this manner to gratify his sexual desires and without her consent.

a cable box on the television. At this point, Appellant was sitting on the end cushion of the couch where A1C ES's feet were and SrA MA was sleeping in a nearby chair. A1C ES rolled over and told Appellant to stop touching her; he did. Appellant told A1C ES they "should go lay down in [SrA MA]'s room," but she told him no and "basically to leave [her] alone." The next thing A1C ES recalled was the alarm going off the next morning.

Three days later, on Saturday, 6 August 2016, Senior Airman (SrA) CD was socializing with Appellant and other co-workers. Appellant accompanied SrA CD outside to smoke a cigarette. Once outside and by themselves, Appellant showed SrA CD two photos and a video on Appellant's cell phone. According to SrA CD, one of the photos depicted a woman with "her shirt pulled up and her bra over her breast" and the other picture showed the same woman's other breast. The video depicted a "woman's vagina and a thumb;" the thumb was "playing with the clitoris and then [it] went down between the lips and then came back up to play with the clitoris." Appellant told SrA CD the photos and video were of A1C ES.

On Monday, 8 August 2016, A1C ES confided in SrA MA that Appellant had touched A1C ES over her leggings while on SrA MA's couch and it made A1C ES feel uncomfortable. A1C ES also told SrA MA that she blocked Appellant's phone number after he kept texting her. Shortly thereafter, A1C ES and SrA MA learned from SrA CD that Appellant had taken sexual photos of A1C ES the night of the party. A1C ES also remembered SrA CD telling her about the video though SrA CD did not remember telling her "that day." Until SrA CD told her, A1C ES was unaware that Appellant had photographed or videorecorded her that night, and she testified she did not give Appellant permission to do either. A1C ES reported the incident to the Sexual Assault Prevention and Response (SAPR) office that same day and subsequently to the Air Force Office of Special Investigations (AFOSI).

## II. DISCUSSION

### A. Jurisdiction

Appellant claims that "the trial transcript" and record of trial fail to prove personal and subject matter jurisdiction over Appellant.[10] Specifically, Appel-

---

[10] Appellant's brief also states that the orders attached to the preliminary hearing report do not establish that the court-martial had jurisdiction over Appellant at the time of the "preliminary hearing" or "during confinement." However, Appellant does not allege in this appeal that the preliminary hearing was defective, nor does he allege lack of jurisdiction during confinement.

lant contends the Government failed to establish his active duty status during the charged timeframe (i.e., on or about 3 August 2016) and failed to properly recall him for trial. It follows, Appellant contends, that the findings and sentence must be set aside because of these failures. We disagree, and find the Government has shown by a preponderance of the evidence that Appellant was on active duty at the time of the offenses and his court-martial. Therefore, Appellant's claims that the Government lacked personal and subject matter jurisdiction must fail.

**1. Additional Background**

During Appellant's trial, a prosecution exhibit was admitted without objection from the Defense—Appellant's AF Form 938, *Request and Authorization for Active Duty Training/Active Duty Tour*—as well as an amendment to the AF Form 938.[11] Appellant was activated from 9 February 2016 through 9 March 2016, and an amendment to these orders amended the release from active duty "thru 5 August 2016." According to the orders, the reporting location was the 307th Aircraft Maintenance Squadron, Barksdale Air Force Base (AFB), Louisiana.

On 4 November 2019, this court granted the Government's motion to attach several documents including: (1) Secretary of Air Force Recall to Active Duty Memorandum, undated; (2) General Court-Martial Convening Authority Recall Memorandum, dated 1 May 2017; (3) Special Order AB-5 (recall dates 13–20 January 2018), dated 11 January 2018; (4) Special Order AB-11 (recall dates 22–28 April 2018), dated 20 April 2018; and (5) Special Order AB-1 (recall dates 14–20 October 2018), dated 12 October 2018. Appellant did not oppose the motion to attach.[12]

---

[11] Air Force Form 938, *Request and Authorization for Active Duty Training/Active Duty Tour,* is the order (identified as Reserve Order No. D6Z16Y in block 32), dated 9 February 2016, authorizing Appellant to active duty. Appellant was assigned to the 307th Aircraft Maintenance Squadron, Barksdale Air Force Base, Louisiana. In block 11, member was ordered to active duty for the purpose of Active Duty Operational Support.

[12] In *United States v. Jessie*, 79 M.J. 437, 442 (C.A.A.F. 2020), the United States Court of Appeals for the Armed Forces (CAAF) recognized that "some [of its] precedents have allowed the [Courts of Criminal Appeals] to supplement the record when deciding issues that are raised by materials in the record," specifically with affidavits or hearings ordered pursuant to *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967) (per curiam). In *Jessie*, the CAAF declined to disturb this line of precedent. 79 M.J. at 444. Accordingly, we understand *Jessie* to permit our review of the materials regarding jurisdiction that the Government moved this court to attach on appeal.

On 5 December 2019, this court granted, over Defense's objection, the Government's motion to attach a sworn declaration from JP, the Military Pay Supervisor for the 307th Bomb Wing, with attachments including two of Appellant's Defense Finance and Accounting Service Military Leave and Earnings Statements (LES). One LES indicates "CHK DT 20160815" for the "period covered" block and, in the remarks section, includes the language "active duty (AD) for training 01 Aug 16 to 05 Aug 16." The second LES indicates "CHK DT 20160824" for the "period covered" block and, in the remarks section, "11.0 days of accrued leave paid for AD tour ending 20160805." JP declares the documents demonstrate that Appellant was paid for duty from 1–5 August 2016, and he was on military status at that time. JP also states that Appellant "sold all the leave days earned during the tour and as such was not on [l]eave status at any point during his tour."

Trial testimony from Appellant's co-workers revealed that Appellant performed military duties prior to, and after, 3 August 2016.

### 2. Law and Analysis

#### a. Jurisdiction at the Time of the Offenses

"Jurisdiction is the power of a court to try and determine a case and to render a valid judgment. Jurisdiction is a legal question which we review de novo." *United States v. Harmon*, 63 M.J. 98, 101 (C.A.A.F. 2006) (internal quotation marks and citation omitted). "Generally, there are three prerequisites that must be met for court-martial jurisdiction to vest: (1) jurisdiction over the offense, (2) personal jurisdiction over the accused, and (3) a properly convened and composed court-martial." *United States v. Nealy*, 71 M.J. 73, 75 (C.A.A.F. 2012) (quoting *Harmon*, 63 M.J. at 101).

General courts-martial have jurisdiction "to try persons subject to this chapter for any offense made punishable by this chapter." Article 18, UCMJ, 10 U.S.C. § 818. "Under Article 2(a)(1), UCMJ, [10 U.S.C. § 802(a)(1),] the military justice system has subject matter jurisdiction over a reservist when that reservist is lawfully ordered to duty or training in the armed forces." *United States v. Morita*, 74 M.J. 116, 118 (C.A.A.F. 2015). Such jurisdiction depends "solely on whether the accused 'was a member of the armed services at the time of the offense charged.'" *United States v. Jordan*, 29 M.J. 177, 184–85 (C.M.A. 1989) (quoting *Solorio v. United States*, 483 U.S. 435, 451 (1987)), *vacated on other grounds*, 498 U.S. 1009 (1990).

The accused's status "is the focus for determining both jurisdiction over the offense and jurisdiction over the person." *United States v. Ali*, 71 M.J. 256, 264 (C.A.A.F. 2012) (citations omitted). "[J]urisdiction over the person depends on the person's status as a person subject to the Code both at the

time of the offense and at the time of trial." *Id.* at 265 (internal quotation marks and citations omitted).

"A reservist is subject to jurisdiction under Article 2(a), UCMJ, [10 U.S.C. § 802(a),] from the date of activation, and answerable under the UCMJ for any offense committed thereafter." *Morita*, 74 M.J. at 120 (citing *United States v. Cline*, 29 M.J. 83, 85–86 (C.M.A. 1989)) (alteration and internal quotation marks omitted). "Jurisdiction continues until 'active service has been terminated.'" *United States v. Hale*, 78 M.J. 268, 271 (C.A.A.F. 2019) (quoting Article 2(c), UCMJ, 10 U.S.C. § 802(c)).

Appellant claims the charges must be dismissed because the Government did not prove at trial that at the time of the offenses he was a member of the Air Force on active duty and thus subject to the personal jurisdiction of a court-martial. Ordinarily, an accused who wants to challenge jurisdiction would move at trial to dismiss the charges under Rule for Courts-Martial (R.C.M.) 907(b)(1). In that event, the burden of persuasion is on the Government to show proper jurisdiction, R.C.M. 905(c)(2)(B), and appellate review is de novo. *See, e.g.*, *Hale*, 78 M.J. at 270 (citing *EV v. United States*, 75 M.J. 331, 333 (C.A.A.F. 2016)). "When challenged, the [G]overnment must prove jurisdiction by a preponderance of evidence." *Id.* (citations omitted). Appellant challenges jurisdiction for the first time on appeal, *see* R.C.M. 907(b)(1), thus we employ the fact-finding authority given to this court under Article 66, UCMJ, 10 U.S.C. § 866, in reviewing information necessary to decide the question. *See, e.g.*, *United States v. Cendejas*, 62 M.J. 334, 338 (C.A.A.F. 2006).

Ordinarily, and "[a]s a general rule, a specification is not required to state the authority for personal jurisdiction over the accused when the accused is on active duty." *United States v. Miller*, 78 M.J. 835, 844 (A. Ct. Crim. App. 2019) (citing R.C.M. 307(c)(3), Discussion), *rev. denied*, 79 M.J. 242 (C.A.A.F. 2019). No special language is required in a specification to allege a basis of personal jurisdiction for military members on active duty. R.C.M. 307(c)(3), Discussion (C)(iv). Special language setting forth a basis for personal jurisdiction is only required for persons subject to the UCMJ under Article 2(a), subsections (3) through (12), none of which apply to this Appellant. *United States v. Gardner*, No. ACM S30091, 2003 CCA LEXIS 198, at *4 (A.F. Ct. Crim. App. 27 Mar. 2003) (unpub. op.).

The dates when Appellant was on active duty and under military jurisdiction are well documented in matters attached to the record of trial. The documentation shows that Appellant was subject to military jurisdiction when he committed each offense. *See* Article 2(a)(1), UCMJ. To reach this conclusion, we need look no further than the AF Form 938 admitted at trial that confirms Appellant's continuous active duty status during the relevant peri-

od. Appellant was initially activated from 9 February 2016 with an initial release date of 9 March 2016, which was subsequently amended to 5 August 2016, a period that encompasses the timeframe charged by the Government.

Appellant contends that he was not on active duty on 3 August 2016 because the amendment to his AF Form 938 states *inter alia*: "16 days of accrued leave have been included in the date shown in block 14. If no leave is taken during the duration of this order, the final duty date will be 20 July 2016."[13] According to Appellant, it follows therefore, that because he sold his leave and did not take it, his final day on active duty was 20 July 2016. Appellant is partially accurate—i.e., if he elected not to take leave during his active duty tour then his last duty day would have been 20 July 2016, allowing for 16 days of leave before his release from active duty on 5 August 2016. However, we find, whether Appellant took his leave or sold his leave, his last day on active duty was 5 August 2016 according to his AF Form 938. This status was further demonstrated by the LES stating Appellant was paid for active duty from 1–5 August 2016.[14]

Appellant next argues, without citation, that the language in 37 U.S.C. § 501(c), "[u]nused accrued leave for which payment is made under subsection (b) is not considered service for any purpose," means the accrued leave days for which Appellant was paid "do not count as military service for any purpose—even court-martial jurisdiction." Appellant has failed to explain how a Title 37 code provision authorizing payment of accrued leave at the time of discharge, separation, or release from active duty impacts our analysis of jurisdiction under Article 2, UCMJ. According to Appellant's AF Form 938, whether Appellant took his leave or not, his active duty status ended on 5 August 2016. That he elected payment for his leave vice using it, or perhaps carrying it over, does not mean his active duty status changed. He was still on active duty until his release date of 5 August 2016.

The testimony, evidence at trial, and matters attached to the record convincingly established Appellant engaged in the charged conduct on 3 August 2016, when he was on active duty and assigned to the 307th Aircraft Maintenance Squadron, and Appellant's reserve unit of assignment was identified in each specification.[15] We find Appellant's AF Form 938 shows he was serving

---

[13] AF Form 938 block 14 is the "release date."

[14] According to A1C ES's testimony at trial, she and Appellant worked in the subsequent days after the party including Friday, 5 August 2016.

[15] The AF Form 938 and other evidence in the record supports an additional basis to find jurisdiction: Appellant received pay and allowances for performing military du-

on active duty while assigned to the 307th Aircraft Maintenance Squadron at Barksdale AFB on 3 August 2016 as charged by the Government for the three offenses that Appellant was found guilty of committing. Thus the Government had subject matter and personal jurisdiction over Appellant at the time of each offense.

### b. Personal Jurisdiction at Trial

Appellant contends that the record of trial did not demonstrate jurisdiction at the time of trial.

By undated memorandum, then-acting Secretary of the Air Force (SECAF) approved a request to recall Appellant to active duty submitted by the commander of the Eighth Air Force who was also the general court-martial convening authority (GCMCA) who referred the charges against Appellant to trial by general court-martial. The SECAF memorandum that was addressed to the Eighth Air Force commander approved Appellant's recall to active duty, stating,

> On 19 December 2016, you requested my approval, pursuant to Article 2(d)(5), Uniform Code of Military Justice, [10 U.S.C. § 802(d)(5),] to recall [Appellant] to active duty, as needed, for military justice action. You made this request so that, if he is convicted, a court-martial may adjudge, and [Appellant] may be required to serve, a sentence to confinement or restriction on liberty. I hereby approve any recall to active duty of [Appellant] that you have ordered or may hereafter order.

On 1 May 2017, the Eighth Air Force commander, by memorandum, ordered Appellant to active duty pending disposition of charges. The 8th Bomb Wing commander issued a series of Special Orders citing 10 U.S.C. § 802(d) involuntarily recalling Appellant to active duty for the periods of 13–20 January 2018; 22–28 April 2018; and 14–20 October 2018. Trial was held on 17 January 2018, 23 April 2018, 26 April 2018, and 15–19 October 2018.

Appellant, citing Article 2(c) and (d)(2)(A), UCMJ, 10 U.S.C. §§ 802(c), (d)(2)(A), avers that even if we consider the documents above they are irrelevant because a reservist can only be recalled for a court-martial if the offenses were committed while the member was on active duty. In Appellant's view it follows that the recall orders are invalid because the Government cannot prove jurisdiction at the time of the offenses. We disagree. Having already

---

ties after consenting to being ordered to active duty and meeting minimum age and mental competence qualifications. *See* Article 2(c), UCMJ, 10 U.S.C. § 802(c).

determined Appellant was on active duty when he committed the offenses, we conclude Appellant was properly recalled to active duty for trial by court-martial without his consent, and the Government had personal jurisdiction over Appellant at the time of his court-martial.

## B. Search of Appellant's Smartphone

On 10 September 2016, AFOSI interviewed Appellant after reading him his rights pursuant to Article 31, UCMJ, 10 U.S.C. § 831. After initially answering questions, Appellant invoked his right to counsel. Agents then directed him to unlock his phone resulting in the discovery of inculpatory evidence which Appellant asserts was obtained in violation of his Constitutional rights and should be suppressed.

### 1. Additional Background

#### a. The Legal Landscape

At the time of Appellant's interview with AFOSI, the United States Court of Appeals for the Armed Forces (CAAF) had not yet decided *United States v. Mitchell*, where the CAAF held that an appellant's Fifth Amendment[16] rights were violated when, after the appellant requested a lawyer, agents still asked him to enter his iPhone's passcode in the absence of counsel, and thus the contents of his iPhone had to be suppressed. 76 M.J. 413, 419–20 (C.A.A.F. 2017). *Mitchell* was decided on 30 August 2017. *Id.* at 413.

On 12 September 2017, the Defense filed a motion to suppress the contents of Appellant's smartphone as evidence derived from a violation of Appellant's Fifth Amendment right to counsel. The Government opposed the motion. On 29 September 2017, a few days before Appellant's trial was set to begin, Appellant filed a motion to release his trial defense counsel and requested a continuance, both of which were granted by the first military judge, Judge Eller.

In October 2017, Appellant's smartphone was sent to the Department of Defense Cyber Crime Center (DC3) to determine in part what analysts would have discovered in September 2016 had Appellant never unlocked his smartphone. The phone was analyzed at DC3 by a forensic examiner, Mr. TH.

On 4 January 2018, the Government filed a supplemental response requesting the next detailed military judge, Judge Degnan, deny the defense motion to suppress the contents of the Appellant's smartphone. On 17 January 2018, the Government and Defense presented evidence and argument at

---

[16] U.S. CONST. amend. V.

an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing. The military judge heard testimony from the lead AFOSI investigator who seized Appellant's smartphone, Special Agent (SA) JJ; testimony from Mr. TH; and the witness who saw the pictures and video when Appellant showed them to him, SrA CD. The military judge also considered several pertinent appellate exhibits that were entered into the record to include Appellant's video recorded interview with AFOSI and forensic analysis reports of Appellant's phone.

In April 2018, the military judge issued a written ruling granting Appellant's motion, suppressing all derivative evidence from Appellant's smartphone. The Government filed a motion to reconsider the military judge's ruling because the military judge did not address inevitable discovery in his initial ruling. The Defense opposed the Government's motion to reconsider. On 26 April 2018, the military judge conducted another Article 39(a), UCMJ, hearing to address the request for reconsideration and heard argument from both sides. The military judge advised the parties by email in July 2018 that he was granting the Government's motion to reconsider based on the inevitable discovery doctrine. At the start of Appellant's trial in October 2018, the military judge provided the substance of the written ruling orally to the parties. In his ruling he stated he was not reconsidering his prior decision that AFOSI violated Appellant's Fifth Amendment right to counsel, but he did find that the Government had met its burden of proving inevitable discovery by a preponderance of the evidence. The military judge's written ruling is dated 31 January 2019.[17] However, our review will be of the military judge's findings of fact contained in his oral ruling and beginning with the actions of the AFOSI agents.

### b. AFOSI

In the military judge's oral ruling, he adopted the following findings of fact from the Government's motion to reconsider his ruling, which we find are not clearly erroneous.[18]

> On 9 September 2016, SA [JJ] received search authorization from the military magistrate to . . . seize and search [Appel-

---

[17] The military judge's written ruling is dated two days after he authenticated the record of trial; as such, we only considered his oral ruling. *See* R.C.M. 905(f); *United States v. Neal*, 68 M.J. 289, 296 (C.A.A.F. 2010) (holding "a case remains in an interlocutory posture so long as the military judge has the power to take action under the UCMJ and Rules for Courts-Martial").

[18] Unless specifically noted, the remaining findings of fact cited in this AOE are also not clearly erroneous.

lant's] smartphone, to include any applications which may contain photographic and videographic evidence of a sexual assault occurring on or about 3 August 2016. [Appellant's] smartphone is black and [a specific] model . . . .

On 10 September 2016 . . . AFOSI agents from Det. 812, Barksdale AFB, LA, began interviewing [Appellant] at their office. . . . [After Appellant] requested an attorney . . . SA [JJ] told [Appellant] the following: "I have your phone and I actually have the authority to search and seize your phone . . . you don't tell us the password, but you have to punch it in, open the phone and then go to the settings and take off all the passwords."

(Last omission in the original.)

[Appellant] complied and while sitting in his chair, in the interview room, [Appellant] began inputting his passcode into his smartphone. The male SA told [Appellant] to show SA [JJ] his phone as he was inputting something into his smartphone. Appellant complied, and leaned over the table, showing SA JJ his smartphone and disabling the passcode security feature. Both SAs watched [Appellant] disable the security feature for approximately one minute. SA [JJ] did not see the passcode that [Appellant] used to unlock his cellphone, she just observed him enter something into the phone[.] Later on, AFOSI requested that [Appellant] unlock an application on his smartphone named "Hide it Pro."

After the application was unlocked, AFOSI discovered several photographs on the smartphone purported to be evidence of the charged violations of Article 120 and 120c[, UCMJ]. They were located in the Hide it Pro application. On 5 and 6 October 2016, AFOSI conducted additional searches of [Appellant's] smartphone and found a video purported to be evidence of the charged violations of Article 120 and Article 120c[, UCMJ]. The video was not in the Hide it Pro application.

SA JJ testified the video was located in the "files portion of the phone" and not in an application. As SA JJ and another AFOSI agent were looking through the smartphone they found the video and initially SA JJ could not get it to play because it required a password. SA JJ and another special agent tried some passwords they had found listed in Appellant's phone without success. However, SA JJ started "going back and forth through the phone" and she was able to make the video play. She does not remember exactly how she

made the video play, but she did make a recording of herself taking the steps to make the video play. She testified she was able to play the video independent of a personal identification number (PIN). The video was less than a minute long and matched SrA CD's description. SA JJ testified that "if I had the phone now I'd probably be able to go through the steps." A few weeks after A1C ES's initial interview, AFOSI called her back in to watch the video and look at the pictures. A1C ES positively identified herself as the person in the photos and video located on Appellant's smartphone.

### c. Bossier City Marshal's Office (BCMO)

The first attempted forensic analysis on Appellant's smartphone was conducted by BCMO at the request of AFOSI. The purpose of sending the smartphone to BCMO was to confirm that the pictures and videos discovered on the phone originated from Appellant's phone rather than being transferred or received from an outside source. The military judge adopted the following finding of fact:

> On 19 October 2016, the phone was sent to [BCMO] for independent analysis due to a 4–6 month backlog at the [DC3]. This was the first time SA [JJ] sent evidence to BCMO; her normal procedure was to send evidence to DC3 for analysis. BCMO analyzed the phone and located several photographs purported to be evidence of the charged violations of Article 120 and Article 120c[, UCMJ] . . . .

In addition, SA JJ testified that the deputy chief of BCMO told her that BCMO "pretty much . . . had the same capabilities as [DC3]." SA JJ provided BCMO information she had learned during her investigation and provided the smartphone to them unlocked. In their written request, AFOSI requested BCMO provide "forensic verification of photographs retrieved from a locked application named 'HIDEITPRO' and a video clip found on the mobile device."

On 9 November 2016, BCMO issued its report. BCMO was able to extract the photographs in the Hide it Pro application but could not locate the video on the smartphone. On 22 December 2016, AFOSI published its report of investigation.

### d. Independent Forensic Examiner

After the smartphone was returned to AFOSI and their investigation had ended, the legal office sent the phone to CP, an independent forensic examiner. SA JJ testified the legal office sent the smartphone to CP for "trial prep." The military judge adopted the following finding of fact:

> In April 2017, Appellant's phone was sent to forensic examiner [CP] for additional analysis. [CP] found the four pictures but

was unable to locate the video purported to be evidence of the charged violations of Article 120 and Article 120c[, UCMJ].

CP's report revealed that she was eventually able to locate but not play the video because it was "locked."

### e. DC3

The military judge adopted the following findings of fact on whether Appellant's smartphone would have been sent by AFOSI to DC3 for a forensic examination if Appellant had never unlocked his smartphone per AFOSI's order:

> If the phone was locked and BCMO was unable to bypass the security code, SA [JJ] was "100% sure" she would have sent it to [DC3] to be unlocked and analyzed. Sending evidence to [DC3] was part of her normal process and she never would have stopped trying to access the phone.

> On 6 October 2017, SA [JJ] sent the phone to DC3 to be analyzed. It was sent at the request of the Barksdale AFB Legal Office. She included BCMO's report with her request but did not provide [DC3] any information about how to access the photos, or the video.

> On 17 January 2018, [Mr. TH], a computer forensic expert employed at [DC3] testified. Mr. [TH] conducted a full forensic examination of [Appellant's] cell phone pursuant to a request from the Barksdale AFB OSI Detachment. The request asked [DC3] to look for files containing photos and a video file of a naked female.

SA JJ also testified that if BCMO had not been able to access the phone, if it remained locked, she was "1000" percent sure she would have no choice but to send the smartphone to DC3.

### i. Access to the phone

Mr. TH testified DC3 was asked "if [they] could find a couple of pictures, and a video file." He also testified they were asked, as of "September 10th, 2016, were we able to unlock the device at that time? Did we have the capabilities to do it?"

The military judge adopted the following additional findings of fact, which we do not find clearly erroneous with the exception of the date 20 September 2016. As noted above Mr. TH was asked about the capabilities as of 10 September 2016—the date Appellant was interviewed and the phone was seized.

. . . Additionally, the request sought information about whether [DC3] possessed the capability to unlock [Appellant's] smartphone without use of his passcode on 20 [sic] September 2016—the date it was seized. OSI did not possess and did not provide Mr. [TH] with [Appellant's] phone passcode. Mr. [TH] did not use [Appellant's] passcode to unlock the phone before analyzing it.

On 20 September 2016, [DC3] possessed three methods that would have allowed them to unlock [Appellant's] phone without his passcode. The first method involves using a tool called Cellebrite Universal Forensic Extraction Device. The [specific] model of cell phone had a vulnerability that allowed user locks to be bypassed. To expose the vulnerability, the phone is turned off, the batteries are pulled out, and it is connected to the Cellebrite physical analyzer. Once connected it is placed into an update or download mode. The mode then gives the examiner the ability to copy the phone without ever having to power it on and enter a user's [PIN] or passcode. It is called a physical boot loader bypass, and [is] specifically designed to bypass user locks. The vulnerability was discovered in 2015, but Cellebrite began providing commercial support for it in June 2016. Mr. [TH] used this boot loader method of copying the phone's contents described above on [Appellant's] phone and received a full copy of the device's contents. The second method [DC3] possessed to access the contents of the phone is called an in system programming, and the third method is referred to as a "chip off." All three methods were available on 20 September 2016. Mr. TH was 100 percent certain and there was no doubt in his mind that his lab could have accessed the entire contents of the phone while in a locked state on 20 [sic] September 2016.

Mr. TH testified that it would have been "fairly simple for [the other examiners at DC3] to do the exact same thing." There was no doubt in his mind that the other examiners at DC3 would have been able to access the phone in the same manner he did.

### ii. Access to the Hide it Pro application and photos

The military judge adopted the following pertinent finding of fact:

While analyzing [Appellant's] cell phone, Mr. [TH] reviewed all 35,000 images on the device. During his analysis he found an application called Hide it Pro. He found the application as part of his normal review process. This application required a [PIN].

> Mr. [TH] was able to find and view the [PIN] for the application during his review of the device. However, because the application only changes the name of the files and obfuscates their location, entry of the [PIN] wasn't necessary to review those files. The Hide it Pro application had been used to hide the location of the four images with a date and timestamp consistent with the time of the alleged sexual assault . . . .

Mr. TH testified that he was able to locate the Hide it Pro application because part of his methodology is to "look at what apps are installed on the device, or were installed on the device" and that he deals "commonly with people who try to hide things, obfuscate things, so [they] know to look for these type of file vault apps." He did not need a PIN to access the content of the application but also testified that through his methodology he could see the PIN. On cross-examination, Mr. TH acknowledged the intake form DC3 received from AFOSI made him aware that he was looking for the Hide it Pro application. However, Mr. TH also testified that because AFOSI's request asked for "pictures and videos" that meant "all pictures and videos." When asked by trial defense counsel if every DC3 examiner would have reviewed all 35,000 pictures, Mr. TH responded: "I would hope so" because "that's our policy." Mr. TH testified he was "100%" certain he would have been able to access the files within the Hide it Pro application if the phone had come to him in a locked state.

### iii. Access to the video

The military judge adopted the following pertinent finding of fact which we do not find clearly erroneous with one minor exception footnoted below.

> The video file . . . was not found in the Hide it Pro application; it was found on the phone itself. It had been encrypted with an application . . . unique to [the specific brand of] phone. Mr. [TH] viewed the first frame of the video but had to use decryption in order to view the entire file. In order to decrypt the file, he asked [DC3's] cryptographer to write a tool allowing him access to the phone.[19] This person was a Ph. D. level cryptographic specialist. The specialist had to write a special python script to decrypt the video on the phone. They were successful in decrypting the video file.

---

[19] The cryptographer wrote a tool to access the video, not the phone.

According to Mr. TH's first report, dated 21 November 2017, without decrypting the video Mr. TH was able to see an "image cache of the beginning of [the] video file," which depicted a female genitalia, fingers, dark pants, and a yellow and white garment. Mr. TH testified: "As it was, I could tell where the video was, when the video got there, how it was played originally, and then I could tell when it was encrypted, but I could only see the first frame of the video until we were able to decrypt the file." The 21 November 2017 report states "[DC3] does not currently possess the capability to decrypt this method of encryption in an offline solution. Viewing this file would require accessing it natively on the [phone]."

Mr. TH testified the decryption process was not based on or aided by anything DC3 was provided by AFOSI or the prior forensic investigations. Mr. TH agreed with the trial counsel's question that at DC3 when they run into an obstacle—"say decrypting a video"—they work until they find a solution to the actual issue.

Mr. TH drafted a second report, dated 27 November 2017, after the DC3 cryptographer created a python-script tool that would decrypt the video. After the file was decrypted, Mr. TH was able to view it. During cross-examination by trial defense counsel, Mr. TH agreed with trial defense counsel that the cryptographer's position at DC3 was "recently filled" after the position was vacated by the previous cryptographer. Mr. TH was not asked how a long a gap existed between the two cryptographers.

### f. Motion to Suppress Ruling

The military judge's oral ruling on the Government's motion for reconsideration recounted the findings of fact he adopted, recited applicable law, and explained his reasoning as follows.

> [T]he government has demonstrated by preponderance of the evidence that when the illegality occurred law enforcement personnel lawfully possessed the [Appellant's] smart phone and were actively investigating and inevitably would have discovered the evidence at issue. That is the pictures and video from the [Appellant's] smart phone in a lawful manner.
>
> . . . The government has demonstrated sufficient evidence by preponderance of the evidence that law enforcement personnel would've inevitably discovered the content of the [Appellant's] smart phone, despite violating the [Appellant's] Fifth Amendment rights to counsel. SA [JJ] testified that if the [Appellant] had refused to unlock his phone and BCMO were unable to bypass the lock, she would have sent it to . . . DC3 for analysis. SA [JJ] was a hundred percent confident that would have been

her course of action . . . . And she testified that would not have stopped her trying to access the [Appellant's] smart phone. Further, unlike *Mitchell*, in this case, the [Appellant's] smart phone was sent to . . . DC3 and the smartphone was examined by a digital forensic examiner. Mr. [TH] who testified that he had three different methods to bypass a user lock and access the contents of the [Appellant's] phone. Further, based on Mr. [TH's] experience, training, and skill, he was able to access the contents of the [Appellant's] smart phone without the pass code. While the investigation into the contents of the [Appellant's] smart phone may at times appear to have been belabored going to local law enforcement, and a private forensic examiner, [and] finally to . . . DC3 where Mr. [TH] personally reviewed 35 thousand images on the [Appellant's] smart phone, and a cryptologist had to write a special [p]ython script to break the encryption on the video, the government's attempts to access the content of the [Appellant's] smart phone were persistent and actively led to . . . DC3 inevitably discovering the evidence in a lawful manner. There is no legal requirement that inevitable discovery be a neat trail devoid of deviations or delays, rather the government must duly demonstrate that it was actively pursuing evidence or leads that would have inevitably have led to the discovery of the evidence in a lawful manner, such as the case here.

**2. Law**

We review a military judge's ruling on a motion to suppress for an abuse of discretion, viewing the evidence in the light most favorable to the prevailing party. *United States v. Hoffman*, 75 M.J. 120, 124 (C.A.A.F. 2016) (citation omitted). A military judge abuses his discretion when: (1) his findings of fact are clearly erroneous; (2) he applies incorrect legal principles; or (3) his "application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citation omitted).

Servicemembers are generally entitled to the protections of the Fifth Amendment. *United States v. Tempia*, 37 C.M.R. 249, 253–55 (C.M.A. 1967). The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." As "[t]he circumstances

surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators . . . the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege." *Miranda v. Arizona*, 384 U.S. 436, 469 (1966). Once a suspect in custody has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981); *see also* Mil. R. Evid. 305(e)(3).

Evidence derived from a custodial interrogation following the accused's invocation of his right to counsel and made outside the presence of counsel is generally inadmissible. Mil. R. Evid. 305(c)(2). However, evidence that would have been inevitably discovered without the illegally obtained information is an exception to this general rule. *See* Mil. R. Evid. 304(b)(3); *see also Mitchell*, 76 M.J. at 420.

For inevitable discovery to apply, the Government must "demonstrate by a preponderance of the evidence that when the illegality occurred, the government agents possessed, or were actively pursuing, evidence or leads that would have inevitably led to the discovery of the evidence in a lawful manner." *Mitchell*, 76 M.J. at 420 (quoting *United States v. Wicks*, 73 M.J. 93, 103 (C.A.A.F. 2014)). "[M]ere speculation and conjecture" is not enough. *Wicks*, 73 M.J. at 103 (alteration in original) (quoting *United States v. Maxwell*, 45 M.J. 406, 422 (C.A.A.F. 1996)). "This exception is only applicable '[w]hen the routine procedures of a law enforcement agency would inevitably find the same evidence.'" *Id.* (alteration in original) (quoting *United States v. Owens*, 51 M.J. 204, 204 (C.A.A.F. 1999)).

Where an error is of constitutional dimensions, an appellate court must conclude the error was harmless beyond a reasonable doubt in order to affirm the result. *United States v. Condon*, 77 M.J. 244, 246 (C.A.A.F. 2018) (citing *United States v. Jerkins*, 77 M.J. 225, 228 (C.A.A.F. 2018)). An error is harmless beyond a reasonable doubt when it "did not contribute to the verdict." *Id.* (citing *United States v. Chisum*, 77 M.J. 176, 179 (C.A.A.F. 2018)).

### 3. Analysis

We begin by adopting the Government's assumption that Appellant's Fifth Amendment right to counsel was violated when SA JJ ordered him to unlock his smartphone and Hide it Pro application with his passcode. As such, the remaining issue is whether the military judge abused his discretion by finding the Government met its burden under the inevitable discovery doctrine.

Under the inevitable discovery doctrine we must view the situation as if SA JJ had never ordered Appellant to input his passcodes and disable the security features on his smartphone. *See United States v. Keller*, No. ACM 37729, 2013 CCA LEXIS 665, at *11 (A.F. Ct. Crim. App. 15 Jul. 2013) (unpub. op.) ("This requires a court to view the situation as it existed at the instant before the unlawful search and determine what would have happened had that unlawful search not occurred."). With that factual landscape, we must determine whether the military judge abused his discretion when he concluded "law enforcement personnel lawfully possessed the [Appellant's] smart phone and were actively investigating and inevitably would have discovered the evidence at issue. That is the pictures and video from [Appellant's] smart phone, in a lawful manner." With regard to the video, we must further assess whether the military judge abused his discretion by concluding the video could have been viewed.

Appellant argues the Government failed to meet its burden to prove by a preponderance of the evidence that (1) when the illegality occurred, law enforcement agents possessed, or were actively pursuing evidence or leads that would have inevitably led to the discovery in a lawful manner; and (2) routine procedures of a law enforcement agency would inevitably find the same evidence.

We find the military judge did not abuse his discretion in finding that the evidence of the pictures and video found on Appellant's phone would have inevitably been discovered in a lawful manner.

### a. AFOSI Possessed or Was Actively Pursuing Leads

The military judge found that when the illegality occurred, law enforcement personnel lawfully possessed Appellant's smartphone and were actively investigating.

Appellant contends that at the time of the illegality SA JJ did not possess, nor was she actively pursuing, evidence or leads that would have inevitably led to the discovery of the evidence in a lawful manner because she had already interviewed the witnesses and obtained a search authorization for Appellant's smartphone. We disagree with Appellant's contentions that SA JJ did not possess leads and was not actively pursuing them.

At the time of the illegality, AFOSI possessed a search authorization to search and seize Appellant's phone, the validity of which Appellant has never contested. SA JJ had possession of Appellant's smartphone, informed Appellant of the search authorization, and then ordered Appellant to unlock his smartphone and disable the password. SA JJ subsequently sent Appellant's phone for analysis. We find the military judge did not abuse his discretion by finding that when the illegality occurred, law enforcement personnel lawfully

possessed the Appellant's smartphone and were actively investigating. We next address whether routine procedures would have ensured access to Appellant's smartphone, photos and video by examining bypassing the smartphone's user lock, accessing the pictures in the Hide it Pro application, and finally accessing and viewing the video.

### b. Routine Investigative Procedures

#### i. Bypass user lock

The military judge concluded that if the Appellant had refused to unlock his smartphone, and BCMO was unable to bypass the lock, SA JJ would have sent the smartphone to DC3 for analysis. He further found that SA JJ was "100 percent" confident that would have been her course of action, and she testified she would not have stopped trying to access Appellant's smartphone. Since the military judge determined the smartphone would first be sent to BCMO, we begin our analysis there.

According to SA JJ's testimony, she was told that BCMO had the same capabilities as DC3. However, no evidence was introduced demonstrating BCMO's capability to bypass the user lock. On appeal, the Government conceded this point during oral argument when it acknowledged the "record is not developed" on BCMO's capabilities. However, the military judge as part of his adopted findings of fact found that when BCMO attempted to analyze Appellant's phone, BCMO "could not locate the video." That was when the smartphone was sent to BCMO with the user lock disabled by Appellant. It follows that even if BCMO had the capability to bypass Appellant's security features, BCMO still would not find the video and SA JJ would have sent the smartphone to DC3 because she wanted access to all of the smartphone's content. SA JJ was asked, "[I]f BCMO had been unable to access *any part of the phone,* what would your next step have been?" (Emphasis added). She responded: "We would have had to send it to [DC3] and just wait." At that point SrA CD had already informed AFOSI that Appellant showed him the video of A1C ES from his phone. We recognize that SA JJ did not send the smartphone to DC3 after BCMO could not find the video. However, at that point, SA JJ had access to both the pictures and the video on the smartphone and *Mitchell* had not yet been decided. We find the military judge did not abuse his discretion by concluding the smartphone would have been sent to DC3 for analysis.

Having determined the smartphone would have gone to DC3 for analysis, we next determine whether the military judge erred when he concluded DC3 had the ability to bypass the user lock. The military judge found that Mr. TH testified he had three different methods to bypass the user lock and access

the contents of the smartphone without Appellant's "passcode," all three of which were available in September 2016.

Appellant contends that the backlog at DC3 of four to six months at the time of the illegality demonstrates that DC3 was not an option. We disagree; what it demonstrates is the Government might have had to wait four to six months.

Appellant next posits that that the military judge failed to account for SA JJ's testimony that it was her leadership, and not SA JJ, who determines where smartphones are sent for analysis. We are not persuaded. Appellant fails to acknowledge SA JJ's subsequent testimony that "they often have weekly meetings where [they] discuss the phones. So pretty much the next course of action would have been discussed at that time" and her acknowledgement that in the "normal course of business" if she needed "to get into something" and cannot, it is sent to DC3.

Appellant argues that although Mr. TH could say with certainty DC3 had the tools available to access the smartphone, he could not state whether the tools could have worked. Appellant contends that Mr. TH's testimony failed to address critical bugs or vulnerabilities which would have impacted his access and it was mere speculation to say otherwise because no one—not BCMO, CP, or Mr. TH—had to force their way into the phone because it was sent to them unlocked. We disagree. Although Mr. TH agreed during his cross-examination by trial defense counsel that there are bugs or vulnerabilities "that we never become aware of," in subsequent testimony he stated there was no doubt in his mind that other analysts working at DC3 could have used the same three methods available at DC3 to access the smartphone's contents.

Finally, Appellant argues there was no guarantee that Mr. TH would have been the examiner assigned to the smartphone, and therefore assignment to a less experienced examiner "could have led to less fruitful results." However, Appellant fails to acknowledge Mr. TH's testimony that it would have been "fairly simple" for any other examiner at DC3 to access the phone, and that examiners consult with each other if they have difficulty when evaluating a device, contrary to Appellant's assertion that it was Mr. TH's unique level of experience which allowed access to the phone. We find the military judge did not err when he concluded that DC3 would have bypassed the user lock on Appellant's smartphone.

### ii. Pictures in Hide it Pro application

Having concluded the smartphone's user lock would have been bypassed, we must next determine if the pictures could have been accessed. Again,

based on the military judge's finding of fact concerning BCMO discussed above, we must begin our analysis there.

According to the report from BCMO, SA JJ was seeking "forensic verification" of pictures in the Hide it Pro application and a "video clip on the mobile device." Although BCMO accessed the pictures from the Hide it Pro application during its analysis, they already knew of the existence of the Hide it Pro application based on AFOSI's search after ordering Appellant to bypass his user lock. Further, as they never found the video and SA JJ needed access to the pictures, video and metadata, we conclude the military judge did not err in his determination that the smartphone would have been sent to DC3.

As to DC3, the military judge found that Mr. TH was "100 percent" certain that his lab could have accessed the entire contents of the locked phone while in a locked state on "20 September 2016."[20] As part of his normal process, Mr. TH found the Hide it Pro application which required a PIN. Mr. TH was able to see the PIN, and recovery email in the preference file for the application, but the PIN was not necessary to view the pictures.[21]

Appellant argues that Mr. TH only found the Hide it Pro application because SA JJ told DC3 of its existence on Appellant's phone. We disagree. Mr. TH testified that as part of his methodology he looks at the applications installed on the device and DC3 commonly deals with people who try and obfuscate things so they know to look for those type of "vault" applications.

In *Mitchell*, the CAAF concluded "the Government's eventual access to the phone's contents was not inevitable, but rather 'a matter of mere speculation and conjecture, in which [the Court] will not engage.'" 76 M.J. at 420 (alteration in original) (quoting *Maxwell*, 45 M.J. at 422). Additionally, the majority in *Mitchell* specifically noted that the Government did not argue that a digital forensic examiner could have bypassed Mitchell's security. *Id*. at 420 n.8. That is not the case here—the Government clearly demonstrated that access to the pictures in the Hide it Pro application was inevitable. As such, we find the military judge did not abuse his discretion by finding the Gov-

---

[20] Although Appellant's subject interview was on 10 September 2016, the facts the military judge adopted had a scrivener's error indicating 20 September 2016. This scrivener's error does not impact our analysis. The testimony during the motions hearing used the correct date of 10 September 2016. Further, Mr. TH's testimony indicated DC3 had the capability to access the phone prior to 10 September 2016.

[21] Mr. TH testified during findings that the recovery email address included Appellant's last name.

ernment demonstrated by a preponderance of the evidence that law enforcement personnel would have inevitably discovered the pictures.

### iii. *Finding and Viewing the Video*

Now, we must determine if finding and viewing the video was inevitable. Again, we begin our analysis with BCMO based on the military judge's finding of fact.

The military judge found that BCMO could not find the video after receiving the phone in an unlocked state. SA JJ testified that she never would have stopped trying to access the phone. We recognize that SA JJ closed her investigation without sending the phone to DC3 even after BCMO could not access the video. However, at that point she was able to access the video herself, and she was only sending the phone to BCMO to confirm her findings and access the metadata. As such, we conclude the military judge did not err in concluding the smartphone would have been sent to DC3.

At DC3, before he even began his analysis, Mr. TH knew a witness had seen the video describing it as Appellant "playing with Victim's vaginal area." Mr. TH found the video, and could see the first frame, but he was unable to view the video because it was encrypted with an application called Privacy Lock unique to Appellant's smartphone model. However, Mr. TH had a vast amount of information just from his analysis of the first frame. He could tell where the video was located on the smartphone, when the video got there, how it was played originally, when the video was played, and when it was encrypted. Moreover, Mr. TH knew from his examination that the video file was 41.429 seconds in length depicting a female's genitalia, fingers, dark pants, and a yellow and white garment. In addition, he knew the video was taken with the Appellant's smartphone on the night of 3 August 2016 (local time) during the same time the five picture files were created. Finally, he knew the video was viewed on the night of 5 August 2016.

Mr. TH's initial 21 November 2017 report stated "[DC3] does not currently possess the capability to decrypt this method of encryption in an offline solution. Viewing the file would require accessing it natively on the [Appellant's smartphone]." This capability was demonstrated by SA JJ twice during the investigation when she initially found the video and played it and when she played it for A1C ES in October 2016.[22] However, SA JJ accessed and viewed the video after the smartphone had been unlocked by Appellant. Neither Mr. TH's reports, nor his testimony, explain the path he would have taken to view

---

[22] SA JJ testified she also played the video for trial defense counsel and a member of the legal office prior to April 2017.

the video natively. The record demonstrates that Mr. TH used the Cellebrite Universal Forensic Extraction Device to copy the smartphone to bypass Appellant's user lock. It is not clear from his motion hearing testimony whether Mr. TH discovered Appellant's PIN for the smartphone, or the method he would use to bypass the user lock in order to gain access to the video using the smartphone itself.[23]

The military judge concluded that a cryptographer had to write a special python script to break the encryption of the video. However, whether due to the Government's oversight at trial or a lack of evidence, there is no indication in the record as to the cryptologic capabilities of DC3 in September 2016 or even four to six months later when one takes into account the backlog at DC3. We do not know when the cryptographer position at DC3 became vacant. We do know there was a cryptographer at DC3 on 21 November 2017 because Mr. TH indicates in his report that he was seeking assistance from the cryptographer on staff at DC3. In January 2018, Mr. TH testified the cryptographer position at DC3 "had recently been filled" without any indication of when the previous cryptographer left or when the position was filled. However, the military judge concluded "a cryptologist had to write a special python script to break the encryption of the video."

The military judge also concluded the "[G]overnment's attempts to access the content of [Appellant's] smartphone were persistent and actively led to [DC3] inevitably discovering the evidence in a lawful manner." Further, during his testimony Mr. TH agreed that at DC3 when they run into a problem—such as decrypting a video—they work until they find a solution to the actual issue. At that point, despite the illegality, SrA CD had reported seeing the video on Appellant's smartphone. Mr. TH could see the first frame of the video and possessed a wealth of other information concerning the video.

Despite a potential gap of a cryptographer at DC3, we cannot say the military judge abused his discretion in concluding the Government demonstrated by a preponderance of the evidence that the entire video, not just the first frame, would have been inevitably discovered based on all the other information before him. This case is distinguishable from *Mitchell* in that the Government lawfully possessed a vast amount of information from the cell phone and a forensic examiner testified concerning his ability to find and view the video. It is not "a matter of mere speculation or conjecture" for the

---

[23] However, Mr. TH did testify, during the findings portion of the trial, that the Cellebrite's physical analyzer did find a file; "what it determined was a [PIN], a likely [PIN] for the phone."

military judge to conclude that the playing of the video was inevitable. *See Mitchell*, 76 M.J. at 420 (quoting *Maxwell*, 45 M.J. at 422).

**C. Legal and Factual Sufficiency**

Appellant challenges his conviction for one specification of sexual assault of A1C ES and two specifications of indecent recording of A1C ES. We are convinced his convictions are legally and factually sufficient.

**1. Additional Background**

Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted). As such, it is beneficial to review the facts presented to the factfinder, some of which already were presented to the military judge during the hearings on the motion to suppress discussed previously.

Appellant argues his conviction is legally and factually insufficient based upon his assertion that: (1) A1C ES's testimony is not credible and is directly contradicted by her own actions which indicates sexual interest in Appellant; (2) A1C ES was not asleep but was instead experiencing a blackout; and (3) Appellant had a reasonable mistake of fact as to consent. We are not persuaded.

A1C ES testified during trial that on 2 August 2016, the day before the date of the charged offenses, she attended a cookout at Appellant's hotel with SrA MA. After they finished eating, SrA MA left, and Appellant and A1C ES decided to go swimming at the hotel pool. While swimming, A1C ES and Appellant had a conversation about a tattoo of a beer mug that A1C ES had on her buttocks.

During the party at SrA MA's apartment the next day, while A1C ES was out on the patio talking to someone else, Appellant sent a text to A1C ES and said, "How does his d**k taste?" A1C ES stated she thought it was "weird and inappropriate," but sarcastically responded "Pretty good." Appellant also sent a text stating something along the lines of "I was going to send you a d**k pic but it was actually going to be [SrA MA]." A1C ES said she did not respond because the text didn't make sense to her.

A1C ES testified that up to the point she woke up to Appellant touching her leggings she had no "blank spots" in her memory. She stated she decided to go back to bed because Appellant did not "come off as someone who would continue to sexually assault [her] in [her] sleep." A1C ES also clarified that after she went "back to bed" she remembers falling asleep and her next memory is an alarm going off the next morning.

A1C ES testified that on Friday, 5 August 2016, Appellant sent a text stating "What's up?" and she did not respond. Then Appellant sent a text ask-

ing "Are you mad at me? You're acting weird." A1C ES replied, "No, everything is fine." A1C ES explained she responded in that manner because Appellant was a reservist and that was supposed to be one of his last days at work, she did not want to "make things weird," and that she felt "uncomfortable." Later that day, Appellant sent a text to A1C ES stating that he wanted to apologize for what happened the night of the party and that he "[w]as drunk enough to f**k around, but not drunk enough to f**k," and said that he "[w]anted to f**k around but [A1C ES] was falling asleep." A1C ES testified she was "creeped out" because she did not feel she gave Appellant any "indication that any of this was okay." She further testified that she responded to one message where Appellant was "kind of asking if [she] remembered what happened," and A1C ES responded to Appellant, "yeah, you were trying to touch me over my leggings." She said she was "weirded out," so she blocked Appellant's phone number and deleted the "creepy" text messages on Friday, 5 August 2019 before she reported Appellant's conduct to law enforcement the following Monday.

That following Monday, A1C ES told SrA MA about waking up to Appellant touching her over her leggings, sending her text messages, and blocking his phone number. A1C ES explained she knew that SrA MA was a victim advocate, and they had become "close over the last month." Within an hour of SrA MA and A1C ES's conversation, SrA CD told A1C ES about the pictures and video he had seen on Appellant's phone, which impacted her decision to go to the SAPR office. A1C ES stated she was unaware of any pictures or video, so if they existed, they were taken without her permission.

Mr. TH testified during findings and was recognized as an expert in the field of computer forensics. He provided the members much of the same information as he did to the military judge during the motions hearing. He testified he received Appellant's smartphone for analysis and used the Cellebrite tool to make a copy of the contents of the phone. During his analysis he found the Hide it Pro application, which was associated with the email account bearing Appellant's last name. In the Hide it Pro application he found four photographs including two pictures of a woman's breast and two of a woman's vagina. The file names included the year, the month, the day, underscore, the hour, the minute, the second; then ending with ".jpg." Therefore, "20160803_232341.jpg" means the picture file was created on August 3, 2016 at 232341 hours local time where the device is located. In addition to the picture noted above, Mr. TH also found pictures 20160803_231601.jpg; 20160803_231645.jpg; and 20160803_231803.jpg. He also testified he found a video on Appellant's smartphone, which was created after the second picture but before the third picture was created, and was encrypted with a privacy lock unique to [the specific brand of] smartphones. The encryption on the video was associated with an email account associated with Appellant's name. Ac-

27

cording to Mr. TH's testimony, the video file was originally created 3 August 2016 at 2316 hours, 56 seconds. Through his analysis Mr. TH testified that both the video player and Hide it Pro application were accessed on 6 August 2016. The privacy lock application closed at about 2302 hours, and about 49–50 seconds later the video application closed. At about 2358 hours the Hide it Pro application closed. Since there was only one encrypted video, Mr. TH opined the encrypted video file opened at 2302 hours and was played. The pictures and video recovered from Appellant's smartphone were admitted into evidence, along with the bra A1C ES wore that night and the blanket she had over her.

During trial, Dr. PS, an expert criminal forensic psychologist, was called by the Defense to testify. Dr. PS testified that he specializes in memory and memory-related issues. He testified about two types of blackouts, an "en bloc blackout" where someone may have hours they cannot account for; and a "fragmentary blackout" where one experiences gaps in recall. He clarified that an individual experiencing fragmentary blackout can talk and engage in sexual conduct but not record memory. He stated further that alcohol disrupts how information is taken in and processed to form short and long-term memory. Additionally, alcohol affects how quickly a person falls asleep by causing them to fall asleep faster but sleep tends to be more easily disrupted, which in turn, affects memory storage. Dr. PS also relayed that individuals who had experienced blackouts in the past are more likely to experience blackouts in the future and have greater memory recall issues when they drink alcohol. Also, women are far more likely to experience fragmentary blackouts due to women's smaller body mass and lower water content as compared to men. A1C ES testified that she had experienced a blackout on at least four or five occasions.

## 2. Law

We only affirm findings of guilty that are correct in law and fact and, "on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289

(C.A.A.F. 2018). Circumstantial evidence may suffice. *See United States v. Kearns*, 73 M.J. 177, 182 (C.A.A.F. 2014) (citing *Brooks v. United States*, 309 F.2d 580, 583 (10th Cir. 1962)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

In order to find Appellant guilty of sexual assault as charged here, the Government was required to prove beyond a reasonable doubt that on or about 3 August 2016, at or near Shreveport, Louisiana: (1) Appellant committed a sexual act upon A1C ES by penetrating her vulva, however slightly, with his finger; (2) Appellant did so when A1C ES was asleep; (3) Appellant knew or reasonably should have known that A1C was asleep; and (4) Appellant did so with an intent to gratify his sexual desire. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(4)(e). "Sexual act" includes the penetration, however slight, of the vulva of another by any part of the body, with an intent to gratify the sexual desire of any person. *MCM*, pt. IV, ¶ 45.a.(g)(1)(B).

> The term "consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue shall not constitute consent.

*MCM*, pt. IV, ¶ 45.a.(g)(8)(A).

A sleeping person cannot consent. *MCM*, pt. IV, ¶ 45.a.(g)(8)(B). "Lack of consent may be inferred based on the circumstances. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist only because of another person's actions." *MCM*, pt. IV, ¶ 45.a.(g)(8)(C).

In order to find Appellant guilty of the first specification of indecent recording as charged here, the Government was required to prove beyond a reasonable doubt that: (1) Appellant knowingly recorded the private area of A1C ES, to wit: her genitalia; (2) that Appellant did so without the consent of A1C ES; (3) the recording was made under circumstances in which A1C ES had a reasonable expectation of privacy; and (4) that Appellant's conduct was wrongful.[24] *See MCM*, pt. IV, ¶ 45c.b.(2).

In order to find the Appellant guilty of the second specification of indecent recording as charged here, the Government was required to prove beyond a reasonable doubt that on or about 3 August 2016, at or near Shreveport, Louisiana: (1) Appellant knowingly recorded the private area of A1C ES, to wit: her genitalia, areola and nipple; (2) that Appellant did so without the consent of A1C ES; (3) the recording was made under circumstances in which A1C ES had a reasonable expectation of privacy and (4) that Appellant's conduct was wrongful. *See MCM*, pt. IV, ¶ 45c.b.(2); *see also* Article 120c.a.(a)(2), UCMJ, 10 U.S.C. § 920c.a.(a)(2).

"The term 'private area' means the naked or underwear-clad genitalia, anus, buttocks, or female areola or nipple." *MCM*, pt. IV, ¶ 45c.a.(d)(2). A reasonable expectation of privacy exists in circumstances where "a reasonable person would believe that a private area of the person would not be visible to the public." *MCM*, pt. IV, ¶ 45c.a.(d)(3)(B). "Consent" has the same definition as described above.

The defense of mistake of fact as to consent applied if Appellant, because of ignorance or mistake, incorrectly believed that A1C ES consented to the sexual act and the recording. *See* R.C.M. 916(j)(1). In order to rely on a mistake of fact as to a consent defense, Appellant's belief must be reasonable under all the circumstances. *See id.*; *see generally United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998) (quoting *United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F 1995)). Once raised, the Government bears the burden to prove be-

---

[24] The requirement for an appellant's conduct to be wrongful—i.e., without legal justification or lawful authorization—is not an element listed in the *MCM*, but it is required by the statute. *Compare* Article 120c.a.(a), UCMJ, 10 U.S.C. § 920c.a.(a), *with MCM*, pt. IV, ¶ 45c.b.(2).

yond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1); *see United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019).

### 3. Analysis

We begin our analysis with a discussion of the sexual assault and then the indecent recording offenses. We then address Appellant's claims as they relate to the three offenses.

#### a. Sexual Assault

The Government introduced into evidence the video found on Appellant's smartphone which depicts penetration, however slight, of the external genital organs of a female with a thumb and finger. SrA CD testified Appellant showed him the video from his smartphone and that Appellant stated the video depicted A1C ES. Moreover, A1C ES confirmed the woman in the video was her. The members could conclude Appellant was the person penetrating A1C ES's vulva with his finger because the video was on his phone. In their review of the video, the members could determine that because A1C ES was not moving in the video and there was a sound consistent with her snoring that A1C ES was asleep. Furthermore, the members could find that Appellant knew or should have reasonably known A1C ES was asleep; and Appellant's actions were without consent. Finally, the members could find that, under the circumstances, Appellant's intent was to gratify his sexual desire as opposed to some innocent purpose, such as to wake her up or get her attention. In this regard, Appellant admitted his intent was to gratify his sexual desire when he texted that he "[w]as drunk enough to f\*\*k around, but not drunk enough to f\*\*k," and "[w]anted to f\*\*k around but [A1C ES] was falling asleep."

#### b. Indecent Recording Offenses

Both indecent recording specifications are supported by the photos and video found on Appellant's smartphone. The video depicts the female genitalia. The photos depict a woman's breast, including the areola and nipple, as well as female genitalia. Appellant told SrA CD that the photos and video were of A1C ES. The members could conclude that because the images were on Appellant's phone, and hidden with an application associated with an email using his last name, that he took the images and that his text messages described above to A1C ES proved his intent to gratify his sexual desires. The members could also determine that the nature and circumstances in which the images were captured and stored proved the wrongfulness of Appellant's actions because A1C ES testified she was asleep and did not consent. Moreover, A1C ES testified she fell asleep and described no memory of being photographed or touched under her leggings. Furthermore, the members could determine that A1C ES was asleep and a sleeping person could not

consent. Finally, the members could determine that a person who falls asleep fully clothed at a friend's house, on a couch in the living room, has not abandoned an expectation of privacy because it is unreasonable for a victim under the circumstances to believe that her private area would be visible to the public as she slept.

### c. Appellant's Claims

Appellant's first argument revolves around the credibility of A1C ES. Appellant contends that A1C ES's testimony that Appellant's conduct was inappropriate and "weird" is directly contradicted by her own actions. Appellant highlights A1C ES's responses to Appellant's texts during the party and the conversation about her tattoo on her buttocks at the pool. However, a rational factfinder could conclude that A1C ES's discussion of a tattoo on her buttocks the day before the sexual assault and responding in kind to a sexual comment from Appellant failed to contradict the proof of the elements of the charged offenses.

Appellant next contends that because A1C ES deleted the text messages from Appellant "shortly" before going to law enforcement, her testimony that they were "creepy" was refuted. However, a rational factfinder could determine that Appellant's additional claim that A1C ES only deleted her messages with Appellant "shortly" before going into AFOSI for an interview was not supported by the evidence. A1C ES testified that she went to AFOSI on Monday, 8 August 2016, but had already deleted the messages on Friday, 5 August 2016. At the time she deleted the messages, Appellant had yet to show SrA CD the pictures and video. A1C ES further testified that she would have turned over her phone to AFOSI if they had asked and she was unaware that the deleted text messages could have potentially been recovered.

Appellant next claims on appeal as he did at trial that A1C ES was not asleep, but actually experiencing a blackout.[25] Appellant highlights A1C ES's testimony, which Appellant contends demonstrated multiple gaps in her memory. Dr. PS also testified that there were some "elements" that were con-

---

[25] Defense's witness Dr. PS testified at trial that during an alcohol blackout

> a person is conscious, they are conversant, they are engaged, but they are not laying down memories during the blackout phase. So in a nutshell, their hippocampus has been knocked off-line. It's a very subtle, kind of, disruption within the brain, but once the hippocampus goes off-line an individual isn't recording memory, but they are able to talk to, engage. Research shows folks . . . in blackout, are able to perform very complex behaviors.

cerning indicating a blackout by A1C ES. However, a rational factfinder could determine that Appellant's argument that A1C ES was blacked out and not actually asleep was inconsistent with the evidence. A1C ES testified she had a memory of closing her eyes to fall asleep and had no "blank spots" in her memory that she could not recall. Dr. PS testified that a specific memory of closing your eyes and laying down, and actually falling asleep, is not consistent with a blackout. Finally, the members could have relied on Dr. PS's testimony that memories tend to fade as they become farther in time from the actual event that occurred to explain A1C ES's inability to recall certain details. Her testimony was over two years after the offenses were committed.

Finally, Appellant argues on appeal as he did at trial that he had a reasonable mistake of fact regarding the consent of A1C ES. Appellant points to the suggestive text messages and argues that given A1C ES's history of blackouts "it is a real possibility she was awake and simply cannot recall and she was engaged to the point where [Appellant] reasonably believed she was consenting." However, based on the evidence at trial the members could have concluded Appellant's mistake of fact, if held, was not reasonable.

Viewing the evidence in this case in the light most favorable to the Prosecution, we conclude a rational trier of fact could find the essential elements of the offenses of which Appellant was convicted beyond a reasonable doubt. The members' findings of guilty are therefore legally sufficient. We have taken a fresh and impartial look at the evidence, and we are ourselves convinced, beyond a reasonable doubt, that Appellant is guilty. Thus, his convictions are factually sufficient.

## D. Sixth Amendment Right to Speedy Trial

On appeal, Appellant avers that "[f]rom April 2018—when the defense was ready to proceed—until October 2018, there was six (6) months of delay" which was a violation of his Sixth Amendment right to a speedy trial.

### 1. Additional Background

Charges were preferred against Appellant on 1 April 2017, and a preliminary hearing was conducted on 8 May 2017. Charges were referred on 15 June 2017 and trial was originally docketed for 2 October 2017. On 29 September 2017, Appellant filed a motion to release his counsel and requested a continuance, which was granted. Trial was then docketed for 15 January 2018. On 15 January 2018, Appellant again requested a continuance due to illness of one of his military defense counsel. Trial was rescheduled for 23 April 2018. On 17 January 2018, Appellant was arraigned and the military judge heard evidence on the Defense's motion to suppress. Both sides argued the applicability of the inevitable discovery doctrine to the facts of Appellant's

case. Appellant is not alleging the delays prior to April 2018 violated his Sixth Amendment right to a speedy trial.

On 21 April 2018, the military judge notified the parties via email that he was granting the defense motion to suppress. He issued his written ruling on 23 April 2018. The same day, in an Article 39(a), UCMJ, session the military judge noted that the Government was considering whether to appeal his ruling pursuant to Article 62, UCMJ, 10 U.S.C. § 862. On 24 April 2018, trial counsel informed the military judge that the Government would be asking him to reconsider his ruling, at which point the military judge gave the Government one day to file its motion and the Defense one day to respond. In its response, the Defense did not object to any continuance and instead requested an Article 39(a), UCMJ, session to present additional evidence and argument on the motion to reconsider.

The first time trial defense counsel referenced Appellant's speedy trial rights was shortly after the Government filed its reconsideration motion. On 24 April 2018, trial defense counsel emailed the military judge and trial counsel objecting to the Government "artificially extending the 72 hour clock" to raising the possibility of filing an appeal to this court pursuant to Article 62, UCMJ, by filing a motion to reconsider. The Defense formally objected to the Government providing notice of appeal after "0855 CST on Thursday, 26 April 2018." Trial defense counsel went on to state that Appellant "desire[d] resolution of this as soon as possible," objected to the Government "causing an artificial delay in this decision to appeal," and argued the delay prejudiced their "client and his right to a speedy trial."[26]

On 26 April 2018, the military judge heard argument on the motion to reconsider via video teleconference. The military judge stated that he would do his best to complete the rulings, with the motion to reconsider his ruling on suppression being the most important. When the military judge raised the issue of docketing the trial, he advised the parties he would provide his calendar so they could discuss trial dates. During this Article 39(a), UCMJ, session the military judge inquired, "I don't know if you all have had a chance to discuss trial dates amongst yourselves," at which point trial counsel informed the military judge, "We've had a chance to briefly discuss, sir, and I think really what will drive everything is the defense team's availability." Appellant made no attempt to clarify trial counsel's statement and raised no objection to the delay.

---

[26] The issue of whether the Government artificially extended the 72 hour timeline to file an appeal with this court was moot, as no appeal was filed.

On 4 May 2018, the trial counsel emailed the military judge and defense counsel inquiring about the status of the military judge's ruling on its motion to reconsider the suppression of the contents of Appellant's smartphone. On the same day the military judge responded, "I am working on this ruling in conjunction with my other cases, but I recognize this is a priority . . . . I have given myself two weeks to complete, but not later than the end of the month."

On 1 and 18 June 2018, the trial counsel emailed the military judge and defense counsel inquiring about the status of the ruling. On 18 June 2018, the military judge responded apologizing for not having responded to the 1 June email and stating that he "will get the ruling completed this week." On 28 June 2018, the trial counsel again emailed the military judge and explained that the Government was considering whether to file a writ to this court to "preserve Appellant's speedy trial right." On the same day, the military judge responded stating that the case he was on had been continued and that he would complete the ruling in the next day or so.

On 2 July 2018, the military judge sent an email to the parties stating the following:

> I have reconsidered my previous ruling granting the defense motion to suppress the cell phone and I am now DENYING the defense motion to suppress the cell phone based on inevitable discovery. I will issue a written ruling prior to our proceeding in Oct.

The military judge issued a scheduling order dated 2 July 2018 indicating the date of trial "ha[d] been docketed for 15–19 October 2018" but it is not clear in the record when the trial was docketed for those days.

On 2 July 2018, civilian trial defense counsel emailed trial counsel and the military judge requesting that the military judge issue his written ruling so that the Defense could consider whether to request a motion to reconsider. Civilian trial defense counsel went on to state:

> We have significant concerns with the five and a half month delay of the trial after the motion to reconsider prejudicing our client's speedy trial rights when the Government introduced no new evidence on the issue of inevitable discovery in their motion to reconsider and made no new arguments or as far as the Defense is aware cited any new case law that they did not originally cite in our motions hearing in January of 2018. So we are at a loss to understand what could have caused the Court to change its mind on this highly nuanced issue and we would request that written ruling as early as possible to understand what the Court saw differently.

Despite his assertion to the contrary, the military judge did not issue a written ruling prior to the October trial date. When the court convened on 15 October 2018, trial defense counsel addressed the delay between April and October, raising the delay in an oral motion for the military judge to recuse himself. Trial defense counsel stated, "We were ready to go to trial in April at that time. We should have had a ruling and we should have pressed through the [Article] 62(a)[, UCMJ, appeal] or back to trial at that point. So now it's been five and half months because of everyone's schedule." Trial defense counsel argued Appellant had been prejudiced because A1C ES was now several months pregnant, which he claimed makes it more difficult for the Defense "to impeach or question the credibility or chastity of a pregnant woman" and "limits our ability to cross-examine her."

During the trial in October, before reading his ruling into the record, the military judge informed trial defense counsel that "when I give my ruling today, defense, you may ask for reconsideration as well," and later "I will give you a reasonable amount of time if you want to consider any type of reconsideration in this case." After the military judge read his ruling into the record, trial defense counsel made an oral motion requesting the military judge reconsider his ruling denying the defense suppression motion. After hearing argument from both sides, the military judge orally denied the motion.

During the voir dire of the military judge on the recusal motion, the Defense asked if the military judge could think of a reason why he did not address inevitable discovery in his original ruling; the military judge responded in the negative. In explaining the delay in issuing his ruling, the military judge stated the issue of inevitable discovery was a highly nuanced issue and he had other cases to handle. The military judge went on to state that "the law allows me to correct a mistake that the judge may have made and that is what I have done."

**2. Law**

We review Sixth Amendment speedy trial issues de novo. *United States v. Danylo*, 73 M.J. 183, 186 (C.A.A.F. 2014) (citing *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)).

An accused's right to speedy trial is protected by statute, by regulation, and by the Constitution. *United States v. Tippit*, 65 M.J. 69, 72 (C.A.A.F. 2007); *see also United States v. Reed*, 41 M.J. 449, 451 (C.A.A.F. 1995)). For military servicemembers, the Sixth Amendment right to speedy trial is triggered by the preferral of charges or the imposition of pretrial restraint. *See Danylo*, 73 M.J. at 186 (citation omitted).

> In determining whether an appellant has been denied his right
> to a speedy trial under the Sixth Amendment, this Court con-

siders the following factors: "(1) the length of the delay; (2) the reasons for the delay; (3) whether the appellant made a demand for a speedy trial; and (4) prejudice to the appellant."

*Id.* (quoting *United States v. Mizgala*, 61 M.J. 122, 129 (C.A.A.F. 2005)). However, "none of the four factors . . . [are regarded] as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Barker v. Wingo*, 407 U.S. 514, 533 (1972).

### 3. Analysis

#### a. Length of the Delay

The first factor in the *Barker* analysis is the "length of the delay" which "is to some extent a triggering mechanism, and unless there is a period of delay that appears, on its face, to be unreasonable under the circumstances, there is no necessity for inquiry into the other factors that go into the balance." *United States v. Cossio*, 64 M.J. 254, 257 (C.A.A.F. 2007) (quoting *United States v. Smith*, 94 F.3d 204, 208–09 (6th Cir. 1996)) (internal quotation marks omitted).

"[C]ircumstances that are appropriate to consider under the first factor include the seriousness of the offense, the complexity of the case, and the availability of proof," among others. *United States v. Schuber*, 70 M.J. 181, 188 (C.A.A.F. 2011) (citing *Barker*, 407 U.S. at 530–31, 531 n.31).

Appellant avers the six-month delay was unreasonable. The Government responds the delay of 178 days—from 23 April 2018 and 18 October 2018—is not unreasonable.

We weigh this factor marginally in Appellant's favor. The CAAF has explained, "an analysis of the first factor is not meant to be a *Barker* analysis within a *Barker* analysis." *Id.* Whereas reasons for the length of the delay are analyzed under the second factor, "circumstances that are appropriate to consider under the first factor include the seriousness of the offense, the complexity of the case, and the availability of proof," among others. *Id.* (citing *Barker*, 407 U.S. at 530–31). In this case, the offenses were serious and the case was moderately complex, particularly motion practice. The availability of proof, including the Defense's expert Dr. PS, is not well established in the record. Still, we find the military judge's delay of 178 days to be attributable to the Government and to be facially unreasonable thus triggering the full *Barker* analysis. In making our determination, we considered the requests of both parties for a ruling, the Government's notification to the military judge that it was considering filing an extraordinary writ with our court to order the military judge to rule, the promises to rule made by the military judge

which were not fulfilled, and the length of time it took for the substance of the ruling to be known to the parties.

### b. Reasons for the Delay

Under the second *Barker* factor, "different weights should be assigned to different reasons" for delay. *United States v. Cooley*, 75 M.J. 247, 260 (C.A.A.F. 2016) (quoting *Barker*, 407 U.S. at 531). In *Barker*, the United States Supreme Court explained:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

407 U.S. at 531 (footnote omitted). "In contrast, 'delay caused by the defense weighs against the defendant.'" *Cooley*, 75 M.J. at 260 (quoting *Vermont v. Brillon*, 556 U.S. 81, 90 (2009)).

Appellant posits that (1) the military judge had more than enough time to decide the inevitable discovery issue in the case and prevent the delay; (2) it should not have taken the military judge an additional six months to rule; and (3) the fact the military judge had other cases and overall docket congestion counts against the Government, not Appellant.

The Government argues that the singular factor which drove the Government's ability to proceed to trial at any point before October 2018 was trial defense counsel's availability. The Government, citing *Danylo*, contends the reason for the delay stemmed from a reasonable prosecution strategy to request a reconsideration of the military judge's ruling. Moreover, the Government contends the delay was two days, and "[o]stensibly the government could have gone back to trial immediately thereafter. The record contains no evidence suggesting the government was responsible for the delay in re-docketing Appellant's case for October 2018." Finally, the Government argues that the military judge issued his ruling in anticipation of the new trial date, which was defense driven.

We find this factor slightly in favor of Appellant. The Government in its response does not address Appellant's argument that it is the Government, and not Appellant, that is responsible for any judicial delay. For purposes of this appeal only, we assume without deciding that Appellant is correct. As noted above the record is not developed explaining the reasons for the 178-delay, nor do we agree the record indicates the Government could have pro-

ceeded to trial in April. We hold the lack of a developed record against the Government, not Appellant. Still, there was no attempt to deliberately delay Appellant's trial to hamper the Defense. The delays by the military judge in ruling are attributable to a neutral reason—his crowded docket. However, as the United States Supreme Court noted in *Barker*, "[a] more neutral reason such as . . . overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." 407 U.S. at 531 (footnote omitted).

### c. Demand for Speedy Trial

Appellant never filed a motion with the court demanding speedy trial or to move the trial up once it was docketed for October 2018. However, he did use the words "speedy trial" in both his 24 April 2018 email, albeit in a different context, and his 2 July 2018 email objecting to the five and a half month delay. Further, the trial counsel herself informed the military judge they were considering seeking a writ with this court to protect Appellant's "speedy trial right." As such, we weigh this factor in favor of Appellant.

### d. Prejudice to Appellant

With regard to the final factor, prejudice, the Court in *Barker* explained:

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.

407 U.S. at 532 (footnote omitted). An accused who asserts a violation of the Sixth Amendment right to speedy trial bears the burden of persuasion to demonstrate the existence of prejudice. *See* R.C.M. 905(c)(2)(A); *Danylo*, 73 M.J. at 189.

Applying the interests noted above, Appellant was not in pretrial confinement and although Appellant avers he experienced anxiety, we agree with the Government that we have no evidence concerning any anxiety on behalf of Appellant due to the 178-day delay. We do not doubt Appellant experienced some anxiety, but we have no basis to conclude it was greater than that ordinarily associated with a trial delay. *Cf. United States v. Wilson*, 72

M.J. 347, 354 (C.A.A.F. 2013) (citations omitted) ("[W]e are concerned not with the normal anxiety and concern experienced by an individual in pretrial confinement, but rather with some degree of particularized anxiety and concern greater than the normal anxiety and concern associated with pretrial confinement.").

As to the final interest, limiting the possibility that the defense will be impaired, Appellant first posits his case was impacted because of his inability to seek reconsideration of the military judge's ruling. We agree with the Government that Appellant's argument is unpersuasive. The military judge informed counsel twice of the option to seek reconsideration of his motion, which they did during the October 2018 trial. Trial defense counsel did not request additional time or request that the court consider additional written filings. We see no impact to Appellant or his trial defense team when they first heard the military judge's ruling on inevitable discovery at trial. Trial defense counsel routinely hear adverse oral rulings and make oral requests for reconsideration just as occurred here.

Appellant next argues that he was prejudiced because A1C ES testified while "pregnant and in tears" at trial. There is no evidence from Appellant what, if any, cross-examination he was unable to conduct due to A1C ES's pregnancy. Our review of the record demonstrates a very extensive cross-examination of A1C ES. Appellant questioned her credibility, her motives to fabricate, the matters admitted by the military judge's Mil. R. Evid. 412 ruling, and questions concerning whether A1C ES was experiencing a blackout vice being asleep. Appellant does not aver, nor do we find, that any defense witnesses were unavailable or that any defense witness was unable to recall events accurately.

Weighing the factors together, we consider the absence of prejudice to outweigh the remaining factors that, taken together, only moderately favor Appellant. Accordingly, we find Appellant's Sixth Amendment right to a speedy trial was not violated.

### E. Recusal of Military Judge

Appellant avers the military judge abused his discretion when he failed to recuse himself. We disagree.

#### 1. Additional Background

When the court-martial reconvened in October 2018, during an oral motion to the military judge to reconsider his ruling on the motion to suppress, trial defense counsel renewed his argument that the evidence from the smartphone should be excluded under the "fruit of the poisonous tree doctrine." The military judge disagreed stating he did not see the taint based on

the way the phone was examined and did not "see any fruit of the poisonous tree."

During the same court-martial hearing in October 2018, trial defense counsel indicated he would like an opportunity to voir dire the military judge. The military judge asked "Are you challenging me, is that right, Sir?" At which point trial defense counsel indicated, "Well, Sir, at this time I would just like to *voir dire* you."

Trial defense counsel questioned the military judge on his knowledge of this court's decision in *United States v. Vargas*, No. ACM 38991, 2018 CCA LEXIS 137 (A.F. Ct. Crim. App. 15 Mar. 2018) (unpub. op.), and the military judge indicated his only knowledge was from reading the case. Trial defense counsel also questioned whether anyone in the "JAG Corps leadership" had ever communicated displeasure at how "Article 120 courts-martial were being handled," and the military judge replied in the negative. At that point the trial defense counsel asked several questions concerning the military judge's granting the Government's motion to reconsider the suppression of the evidence from Appellant's smartphone including: (1) why the military judge changed his mind when no new facts or caselaw were presented in the Government's motion to reconsider on the issue of inevitable discovery; (2) what took the military judge so long to make a decision; and (3) whether the military judge discussed the ruling with his fellow military judges.

As to the first question—why he changed his mind—the military judge responded he could not think of a reason he did not address inevitable discovery in his initial ruling. As to the second question—the timing of his ruling— the military judge responded, "[O]ther than my scheduling of other cases that I had to do, that would be the only reason why I couldn't get my ruling done in a timely fashion. So when I give my ruling today, defense, you may ask for reconsideration as well." As to Appellant's third question—conversations military judge had with colleagues—the military judge made it clear that although he may have conversations with his fellow judges on issues in his cases, "[A]ll the things I do in my cases are based on my decision." He also later clarified that no one told him how to rule on this motion, and that he may "discuss cases with colleagues, and we are not going to get into that, because frankly, that's none of your business . . . but in regard to this case, no one told me to change my mind." Finally, he also clarified that his conversations with colleagues about issues and cases was "none of [his] concern, nor is [it] relevant here." He further clarified,

> In regards to this case, the rulings I come up with are based on
> the law and the evidence that has been presented and my own
> review and application of that. No one has told me to rule one

way or the other. No one has told me to deny a motion, or grant a motion, or any of that. They have not done any of that.

Trial defense counsel also addressed the lack of a written ruling to the "[Mil R. Evid.] 412 motion" at which point the military judge stated, "That is a fairly straightforward [Mil. R. Evid.] 412 motion.[27] Would you agree [trial defense counsel]?" After trial defense counsel agreed it was much less complicated, the military judge replied, "Is this your first—this isn't your first Article 120[, UCMJ,] case, right, [trial defense counsel]?" After the trial defense counsel replied it was not his first Article 120, UCMJ, case, the military judge responded, "So you have a lot of experience and you all briefed that issue very well. You laid out all of the facts for me."

After trial defense counsel finished his questioning of the military judge, he requested, and was granted, time to determine whether Appellant wanted to challenge the military judge. After the recess, trial defense counsel indicated he was challenging the military judge. Trial defense counsel indicated they were not challenging the military judge merely for his reconsideration of his prior ruling, but because, "[W]e have lost faith in the impartiality of this tribunal and the impartiality of this process and your ability to, essentially, maintain fair interest of justice in this case." Trial defense counsel then argued as a basis for recusal the delay in the military judge issuing his ruling thereby prejudicing Appellant in several ways. Specifically, the delay impacted Appellant's right to a speedy trial, impaired his strategy in regards to cross-examining A1C ES who was now pregnant, and impaired his ability to prepare his Mil. R. Evid. 412 motion as well as a motion for reconsideration on the suppression of the contents of Appellant's smartphone.

The military judge responded regarding his reconsideration of the suppression motion that the law allows him "to correct a mistake that the judge may have made and that is what I have done," to which the trial defense counsel stated, "Yes, Sir. And that is your right." Trial defense counsel then clarified that his concern was that they did not understand the reason why the military judge changed his mind with respect to the motion for reconsideration. Trial defense counsel then argued that when considering all the ways in which Appellant was prejudiced due to the military judge's delay, it raised a question as to the impartiality and fairness of the trial under R.C.M. 902. At that point the military judge indicated he was going to provide his rulings

---

[27] Appellant does not allege error with regard to the Mil. R. Evid. 412 motion on appeal.

on the record and then, if needed, attach the written rulings prior to authentication, all in compliance with the rules.

Prior to denying the Defense's motion, the military judge noted several recusal cases and the applicable standard under R.C.M. 902. The military judge then stated:

> All right. Defense, I'm going to deny your request. I'm not going to recuse myself from this case. I have looked at the case *Vargas* and it is factually not related at all to this case. I have looked at the [R.C.M.] 902, the disqualifications of the military judge, neither are any of these categories present. And I have answered your questions, defense counsel.
>
> I'm not going to discuss conversations I had with my colleagues about issues involving law or anything else, but in regard to this case, no one has told me how to rule on any issue in this case. No one has said I should rule one way or the other. All the decisions I have made have been based on the evidence and the facts and my application of the evidence to the facts, as well as my conscience, and as well as my responsibility of being a judge and having to make decisions that affect the parties.
>
> And, defense, I understand you're upset about the length of time this case has taken. There was a delay when [Judge] Eller was the judge in this case. There have been several delays. We've had several amended scheduling orders, two of them. The court wasn't able to produce a written ruling, however, I am going to give my ruling. I am going to read it on the record and, defense, I will give you a reasonable amount of time if you want to consider any type of reconsideration in this case, but I would also remind the counsel that we have had discussions and I have told you [if] there are issues of precedent—or, excuse me—issues of importance, and I am not responding or replying to your emails, that you are to text or call me, pick up the phone, and we will have a [R.C.M.] 802 conference. That is not to disparage either side. I am not doing that. I am merely stating for the record that is my practice in all of my courts that when sometimes I am on the road, sometimes I am doing back-to-back cases and my email, frankly, doesn't work.
>
> I understand your concerns, defense. I don't think they are warranted. I think if you look at the rulings, I have ruled for the defense and I have also ruled for the government. And no one has told me what to do on this case. So I don't think *Vargas*

applies. I think the standard would apply. I think that particular fact pattern in *Vargas* is completely different from this case and when I look at rule for court-martial 902 I don't see a reason why I should disqualify myself. I don't think the public will lose faith in this process. I don't think there has been any evidence that I have somehow done anything inappropriate in this case. Nor have I—nor do I believe counsel, including the SVC— I don't believe anybody has acted inappropriate in this case.

All right. So I am not going to recuse myself.

Appellant argues the military judge abused his discretion by failing to recuse himself because (1) it is unreasonable to conclude that the military judge simply made an error in his initial written ruling by failing to consider inevitable discovery; (2) the military judge was not "forthcoming in cataloging the basis for his reversal;" (3) the military judge assumed a "defensive posture;" and (4) a reasonable observer would believe Appellant did not get a fair trial because the military judge was overwhelmed by his caseload.

**2. Law**

We review a military judge's ruling on a motion that he recuse himself for an abuse of discretion. *United States v. Sullivan*, 74 M.J. 448, 453 (C.A.A.F. 2015) (citations omitted). "A military judge's ruling constitutes an abuse of discretion if it is 'arbitrary, fanciful, clearly unreasonable or clearly erroneous,' not if this Court merely would reach a different conclusion." *Id.* (quoting *United States v. Brown*, 72 M.J. 359, 362 (C.A.A.F. 2013)).

"An accused has a constitutional right to an impartial judge." *United States v. Wright*, 52 M.J. 136, 140 (C.A.A.F. 1999) (citations omitted). R.C.M. 902 governs disqualification of the military judge. R.C.M. 902(b) sets forth five specific circumstances in which a "military judge shall disqualify himself or herself." In addition, R.C.M. 902(a) requires disqualification "in any proceeding in which th[e] military judge's impartiality might reasonably be questioned." Disqualification pursuant to R.C.M. 902(a) is determined by applying an objective standard of "whether a reasonable person knowing all the circumstances would conclude that the military judge's impartiality might reasonably be questioned." *Sullivan*, 74 M.J. at 453 (citing *Hasan v. Gross*, 71 M.J. 416, 418 (C.A.A.F. 2012) (per curiam)).

"There is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle, particularly when the alleged bias involves actions taken in conjunction with judicial proceedings." *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001) (citation omitted). "[R]emarks, comments, or rulings of a judge do not constitute bias or partiality, 'unless they display a deep-seated favoritism or antagonism

that would make fair judgment impossible.'" *Id.* at 44 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

Recusal based on an appearance of bias is intended "to promote public confidence in the integrity of the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 858 n.7 (1988) (citations omitted). However, this "appearance standard does not require judges to live in an environment sealed off from the outside world." *United States v. Butcher,* 56 M.J. 87, 91 (C.A.A.F. 2001).

"Although a military judge is to 'broadly construe' the grounds for challenge, he should not leave the case 'unnecessarily.'" *Sullivan*, 74 M.J. at 454 (quoting R.C.M. 902(d)(1), Discussion). "Of course, [a] . . . judge has as much obligation not to . . . [disqualify] himself when there is no reason to do so as he does to . . . [disqualify] himself when the converse is true." *United States v. Kincheloe*, 14 M.J. 40, 50 n.14 (C.M.A. 1982) (alterations in original) (internal quotation marks and citations omitted).

"Nevertheless, despite an objective standard, the judge's statements concerning his intentions and the matters upon which he will rely are not irrelevant to the inquiry." *Wright*, 52 M.J. at 141 (citations omitted). In certain circumstances, the cumulative nature of facts may create a reason for questioning a military judge's impartiality, even though none of the facts, in isolation, necessitates recusal. *See Sullivan*, 74 M.J. at 455 (quoting *United States v. DeTemple*, 162 F.3d 279, 287 (4th Cir. 1998)).

"[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555; *see also United States v. Cooper*, 51 M.J. 247, 251 (C.A.A.F. 1999) (holding a military judge's personal expression of irritation with a defense counsel did not divest him of the necessary appearance of impartiality); *United States v. Gray*, 51 M.J. 1, 51–52 (C.A.A.F. 1999) (finding military judge's criticism of defense counsel's failure to interview possible defense witnesses and statement that defense counsel was unable to ask intelligible voir dire questions was not biased or inappropriate); *United States v. Loving*, 41 M.J. 213, 257 (C.A.A.F. 1994) ("Generally, courtroom clashes between counsel and the judge do not constitute disqualifying bias."). "Questioning of defense counsel by a trial judge is not uncommon, not inappropriate, and not evidence of bias." *United States v. Khan*, No. ACM 38962, 2017 CCA LEXIS 488 at *24 (A.F. Ct. Crim. App. 20 Jul. 2017) (unpub. op.).

R.C.M. 905(f) provides that "on request of any party or *sua sponte*, the military judge may, prior to authentication of the record of trial, reconsider

any ruling, other than one amounting to a finding of not guilty made by the military judge."

### 3. Analysis

We conclude the military judge applied the correct legal standards and did not abuse his discretion when he declined to recuse himself from the case. His conclusions regarding the applicability of R.C.M. 902 and caselaw were not "arbitrary, fanciful, clearly unreasonable or clearly erroneous," either at the time or in hindsight. *See Sullivan*, 74 M.J. at 453 (quoting *United States v. Brown*, 72 M.J. 359, 362 (C.A.A.F. 2013)) (internal quotation marks omitted). We reach this conclusion for the following reasons.

As an initial matter, we recognize the strong presumption that a military judge is impartial, particularly when the alleged bias involves actions taken in conjunction with judicial proceedings. *Quintanilla*, 56 M.J. at 44 (citation omitted).

Second, the military judge complied with R.C.M. 905 regarding his ruling on the motion to suppress. The military judge gave his ruling on the record before pleas were entered. *See* R.C.M. 905(d). His reconsideration of his ruling for the motion to suppress complied with R.C.M. 905(f).

Third, we note the military judge's statements on the record that "no one told me . . . what to do on this case;" "no one has said I should rule one way or the other;" and "[a]ll of the decisions I have made have been based on the evidence and the facts and my application of the evidence to the facts, as well as my conscience." *See Wright*, 52 M.J. at 141.

Appellant argues that unlike the military judge in *Sullivan*, the military judge did not catalogue the basis for his reversal. Appellant's reliance on this point in *Sullivan* is misplaced. The military judge in *Sullivan* catalogued his relationship with *participants* in a trial—he was not asked to reveal his deliberative process to include conversations with fellow military judges.[28] *See* 74 M.J. at 451–53. Appellant fails to cite to any authority requiring the military judge to "catalogue his basis for reversal" or reveal conversations with his fellow military judges.

---

[28] We note, "[J]udges, like Presidents, depend upon open and candid discourse with their colleagues and staff to promote the effective discharge of their duties. . . . Confidentiality helps protect judges' independent reasoning from improper outside influences. It also safeguards legitimate privacy interests of both judges and litigants." *United States Navy-Marine Corps Court of Military Review v. Carlucci*, 26 M.J. 328, 337 (C.M.A. 1988) (quoting *In re Certain Complaints Under Investigation*, 783 F.2d 1488, 1519–20 (11th Cir. 1986)).

Fourth, we find it important that the military judge candidly admitted that he made a mistake in failing to initially address inevitable discovery in ruling on the motion to dismiss. Appellant argues on appeal that "[i]t is unreasonable to assume the military judge simply made an error in his initial ruling and/or forgot to consider whether there was an exception to the exclusionary rule." We disagree. We have no reason to question the military judge's statement that he made an error and R.C.M. 905 allowed him to correct that error.

Fifth, our reading of the entire record does not disclose a defensiveness on the part of the military judge. Even if we assume defensiveness as Appellant argues, the Supreme Court has made clear that "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, . . . sometimes display" do not establish bias or partiality. *Liteky,* 510 U.S. at 555–56. The Supreme Court stated further, "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* at 555. Appellant has not persuaded us that the military judge's remarks support a conclusion of bias or partiality.

Sixth, we find all of the military judge's comments "remained well 'within [judicial] bounds' and his 'remarks, comments, [and] rulings' did not 'display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *See Khan*, unpub. op. at *26 (alterations in original) (quoting *Quintilla*, 56 M.J. at 44).

Appellant contends that the military judge summarily dismissed the Defense's request that he reconsider his ruling on the motion to suppress and failed to put any findings of fact or conclusion of law on the record contrary to *United States v. Flesher*, 73 M.J. 303, 311–12 (C.A.A.F. 2014). Appellant posits the military judge disregarded trial defense counsel's request that the military judge reconsider his ruling based on the "fruit of the poisonous tree doctrine." However, the military judge ruled on the record and denied the defense motion for reconsideration after hearing argument on whether the fruit of the poisonous tree doctrine required a different result which Appellant had argued previously. To rebut trial defense counsel's argument that DC3's analysis was subject to "taint," trial counsel highlighted to the military judge that:

> [Mr. TH] was able to testify specifically that he reviewed each of the images on the phone and all of the -- without any requirement, any information whatsoever from the accused. In fact, it wasn't hard for him to gain access or find any specific file on that phone. He was able to access everything inde-

> pendently of anything that he received from any previous eval-
> uation. And in fact, I believe his testimony was that he didn't
> rely on any of that when conducting his analysis.

The military judge stated that "based on how the phone was examined" he did not see "any fruit of the poisonous tree" or "taint" as argued by defense counsel. The military judge noted that he had discussed Mr. TH's review of the smartphone in his ruling, and that he concurred with the position that the Government "just made." In addition, the fruit of the poisonous tree argument was previously presented to the military judge both in the Defense's written response to the Government's motion for reconsideration and their argument. Moreover, the Defense's motion was to reconsider a ruling for which the military judge had already made findings of fact and conclusions of law on the record and no new evidence was presented, only argument. The fact that the Defense wanted the military judge to specifically address the fruit of the poisonous tree doctrine did not invalidate the military judge's prior findings of fact and conclusions of law. Finally, the military judge did not evade or ignore the Defense's motion for reconsideration; he heard argument and affirmatively ruled on the record; and he provided a "clear signal" that he applied the right law.[29] *See id.*[30]

Seventh, no reasonable person knowing all the circumstances would conclude that the military judge's impartiality might reasonably be questioned. *See Sullivan*, 74 M.J. at 453 (citing *Hasan*, 71 M.J. at 418). Appellant argues that a reasonable observer would believe Appellant did not get a fair trial because the military judge was overwhelmed by his caseload. However, our observations of the record of trial indicate otherwise.

Eighth, we find Appellant's case substantially unlike those in which the CAAF has found, or assumed without deciding, that the presiding judge was disqualified. *See, e.g.*, *United States v. Martinez*, 70 M.J. 154, 158–59 (C.A.A.F. 2011) (presiding judge's judicial supervisor privately conferred with trial counsel before accompanying judge into chambers); *United States v.*

---

[29] We note that in his written ruling the military judge addressed the Defense's fruit of the poisonous tree argument in a footnote. However, as noted previously, we did not consider the military judge's written ruling in our analysis because it is dated after the record was authenticated.

[30] The CAAF in *Flesher* noted that "[w]hile not required, where the military judge places on the record his analysis and application of the law to the facts, deference is clearly warranted." 73 M.J. at 312. The CAAF also noted that "the reverse is also true, if the military judge fails to place his findings and analysis on the record, less deference is accorded." *Id.*

*McIlwain*, 66 M.J. 312, 314 (C.A.A.F. 2008) (holding that the military judge declined to recuse herself after she "announced that her participation 'would suggest to an impartial person looking in that I can't be impartial in this case'"); *Butcher*, 56 M.J. at 88–90, 92 (off-duty social contact between military judge and trial counsel during trial).

Ninth, the cumulative nature of the facts do not create a reason in the mind of a reasonable person with full knowledge of the facts for questioning the military judge's impartiality. *See Sullivan*, 74 M.J. at 455 (quoting *De-Temple*, 162 F.3d at 287).

We find Appellant's complaints, which all relate to the military judge's conduct within the judicial context, fail to rebut the strong presumption of the military judge's impartiality.

## F. Post-Trial Delay

Appellant's court-martial concluded on 19 October 2018. The convening authority, took action 124 days later on 20 February 2019.

In *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006), our superior court established a presumption of facially unreasonable post-trial delay when the convening authority does not take action within 120 days of trial.

Since the convening authority took action 124 days after the trial in this case, there is a facially unreasonable delay. As a result, we examine the four factors set forth in *Barker*: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice" to the appellant. *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004) (per curiam)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

### 1. Length of the Delay

As to the first factor—the length of the delay—the 124 days that elapsed from the conclusion of Appellant's trial until the convening authority took action exceeded the *Moreno* standard by four days. The Government concedes this four-day delay is presumptively unreasonable, and we agree. This factor weighs in Appellant's favor.

### 2. Reasons for the Delay

As to the second factor—the reasons for the delay—the Government argues the delay is adequately explained in the record. First, the Government argues trial defense counsel took three days longer than trial counsel to return his transcript edits to the court reporter. Further, the 876-page transcript was divided among three court reporters. Finally, Appellant's court ended in the fall necessitating transcription over a busy holiday season and a National Day of Mourning for President George H.W. Bush. Appellant argues that there was a significant delay in transcribing the record because the court reporters elected to wait until the conclusion of the trial to begin transcribing, even though the first 126 pages cover the first motions hearing held on 17 January 2018, and the second and third motions hearings cover 100 pages of transcript from 23 and 26 April 2018. Appellant contends transcription did not begin until 30 October 2018 and ended on 30 January 2019.[31]

We did however note the trial defense counsel raised several legal errors in his request for clemency and the addendum to the staff judge advocate's recommendation addressing the legal errors was dated three days later.

As the record of trial provided no rationale for why the court reporters elected to wait to transcribe the sessions of the court held in January and April of 2018, we find this factor marginally in favor of Appellant.

### 3. Request for Speedy Post-Trial Processing

As to the third factor—Appellant's assertion of his right to timely review—Appellant made no demand for speedy post-trial processing, but instead asserts that his previous demands for a speedy trial should have indicated the importance of expeditiously processing his entire case. We are not persuaded that Appellant exhibited any concern about the speed at which the post-trial processing of his case was occurring. We find that this factor weighs in the Government's favor.

### 4. Prejudice

Turning to the fourth factor—prejudice—the CAAF in *Moreno* noted prejudice should be assessed in light of three similar interests for prompt appeals: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39. Where, as here, an appellant does not prevail on the substantive

---

[31] One court reporter began transcription on 29 October 2018, the second began on 30 October 2018. However, the third court reporter, TSgt EC, in her chronology indicated she began transcribing on 19 October 2018. Even if Appellant is correct that transcription began on 30 October 2018, it would not change our analysis.

grounds of his appeal, there is no oppressive incarceration. *Id.* at 139. Similarly, where an appellant's substantive appeal fails, his ability to present a defense at a rehearing is not impaired. *Id.* at 140.

Appellant made no claim of prejudice due to the delay. Appellant did state "given the strength of his appellate issues including the unreasonable delay in violation of his Sixth Amendment right to speedy trial, it is evident that he would want these issues resolved as soon as possible." However, we agree with the Government that this statement is a conclusory opinion, not a claim of prejudice suffered.

We find Appellant had no "particularized anxiety or concern that is distinguishable from the normal anxiety experienced" by appellants awaiting an appellate decision. *See id.* Consequently, we conclude that Appellant has not demonstrated he suffered any prejudice as a result of the post-trial delay, and this factor does not weigh in his favor.

### 5. Balancing of the *Barker* Factors

Considering all of the factors together in our review of this case, we do not find a violation of Appellant's due process right to timely post-trial processing.

### 6. *Tardif* analysis

Although we find no due process violation in Appellant's case, we nonetheless consider whether Article 66(c), UCMJ, relief pursuant to *United States v. Tardif* is appropriate. 57 M.J. 219, 224 (C.A.A.F. 2002). We are guided by factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), with no single factor being dispositive.[32]

Applying these factors and considering the circumstances of Appellant's case, we conclude that no relief is warranted.

---

[32] These factors include: (1) how long the delay exceeded the standards set forth in *Moreno*; (2) what reasons, if any, the Government set forth for the delay, and whether there is any evidence of bad faith or gross indifference to the overall post-trial processing of this case; (3) whether there is nonetheless evidence of harm (either to the appellant or institutionally) caused by the delay; (4) whether the delay has lessened the disciplinary effect of any particular aspect of the sentence, and whether relief is consistent with the dual goals of justice and good order and discipline; (5) whether there is any evidence of institutional neglect concerning timely post-trial processing, either across the service or at a particular installation; and (6) whether, given the passage of time, whether this court can provide meaningful relief in this particular situation. *United States v. Gay*, 74 M.J. 736, 744, *aff'd*, 75 M.J. 264 (C.A.A.F. 2016).

On the whole, while the processing of Appellant's case was perhaps not as expeditious as it could have been, we perceive no substantial harm to Appellant, prejudice to the interests of justice or discipline, or erosion of this court's ability to conduct our review or grant appropriate relief based on post-trial delay that would move us to reduce an otherwise appropriate sentence imposed by the military judge and approved by the convening authority.

## G. Appellate Delay

Appellant's case was originally docketed with this court on 7 March 2019. Although not asserted by Appellant, the delay in rendering this decision after 7 September 2020 is presumptively unreasonable. However, we determine there has been no violation of Appellant's right to due process and a speedy post-trial review and appeal.

Appellant submitted his initial assignments of error on 3 October 2019, after four Appellant-requested enlargements of time. The record of trial is sizeable, including over 876 pages of transcript and 75 exhibits. Oral argument was held on 5 February 2020. The Government filed a memorandum of argument on 11 February 2020. Appellant filed a 27 February 2020 reply to the Government's memorandum of argument. In Appellant's reply, he included a footnote requesting speedy appellate processing.

We apply the same legal principles to appellate delay as in post-trial delay. In this case, we find no oppressive incarceration nor impairment of the Defense at a rehearing because Appellant has not prevailed in his appeal. *See id*. at 140. As for anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id*. Appellant has articulated no such particularized anxiety in this case, and we discern none. Further, Appellant has not asserted that he is entitled to relief for appellate delay. Accordingly, we do not find the delay so egregious as to adversely affect the perceived fairness and integrity of the military justice system. *Id*.

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See Tardif*, 57 M.J. at 225. After considering the factors enumerated in *Gay*, 74 M.J. at 744, we conclude it is not.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact and no error materially prejudicial to the substantial rights of Appellant occurred. Ar-

ticles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court